UNITED STATES of America

v.

Carl A. BENSON, Appellant, et al.

No. 73–1376.

United States Court of Appeals,
Third Circuit.

Argued Sept. 11, 1973.

Decided Nov. 26, 1973.

As Amended Dec. 7, 1973.

Edward B. Servov, McKeesport, Pa., John P. Flaherty, Jr., Pittsburgh, Pa., for appellants.

Kathleen Kelly Curtin, Asst. U. S. Atty., Pittsburgh, Pa., Richard L. Thornburgh, U. S. Atty., Charles F. Scarlata, Asst. U. S. Atty., for appellee.

Before McLAUGHLIN, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal involves a conviction for a violation of the criminal anti-fraud provisions of the federal Securities Act of 1933 growing out of intrastate offerings and sales of securities. Appellant, Carl Benson, appeals from a conviction and sentence of the district court for the Western District of Pennsylvania for a violation of Section 17(a) of the 1933 Securities Act, 15 U.S.C. § 77q(a). United States v. Benson, Opinion of March 13, 1973 (Crim. No. 68–202, W.D. Pa.).

Benson was president and principal stockholder of C. A. Benson & Co., Inc., a Pennsylvania corporation registered with the U.S. Securities and Exchange Commission (SEC) as a broker-dealer in securities. He and six salesmen of his company were indicted and tried to a jury on 33 counts for violation of Section 17(a) of the 1933 Act by wilfully perpetrating a scheme to defraud in the offer and sale of securities by use of the mails. They were also charged and tried for 23 counts of mail fraud and one count of conspiracy. After a trial of approximately eight weeks, the salesmen were acquitted on all counts; Benson was acquitted on all counts except

one count of fraud in the sale of securities. After sentencing, this appeal followed.

The charges against Benson stem from the efforts of Benson & Co., Inc., as underwriter and broker-dealer for the Home Makers Savings Corporation (HMS). HMS was incorporated in Pennsylvania in 1961 to sell and distribute household appliances. By 1962, however, the corporation became concerned solely with the merchandising of natural vitamin products. In mid-year it undertook the marketing of "Mr. Enzyme," purported to be a food supplement to aid the human digestive process. Beginning in January 1963 the marketing of "Mr. Enzyme" became the sole business of HMS. Norwich Pharmaceutical Company became the sole distributor of the product; Strong-Cobb-Arner, Inc., its sole supplier.

Benson & Co., Inc., served as underwriter for two intrastate offerings of HMS stock. The first offering was made in January 1962 and consisted of 35,000 shares at $3.00 per share; the second was made in September 1962 and consisted of 20,000 shares at $5.00 per share. As a result, Benson & Co., Inc., raised $205,000 on behalf of HMS. Of that sum, $157,440.94 was received by HMS; the remainder was paid to Benson & Co., Inc.

Since 1962, Benson had maintained close ties to the HMS corporation. In that year he was elected to the board of directors. Commencing June 20, 1962, he additionally served as the company's vice-president and president and later was retained as a paid financial consultant.

From its inception, HMS never operated at a profit. In its effort to develop a market for "Mr. Enzyme," HMS spent in excess of $75,000 for advertising during the first quarter of 1963. During the same period, its net sales were $73,760.68. As of April 30, 1963, total liabilities of the company exceeded total assets, a condition which became aggravated with the passage of time. As of May 31, 1963, the corporation had an ac-

cumulated operating deficit in excess of $200,000.

In mid-1963 the difficulties of HMS were exacerbated by proceedings, instituted by both the federal government and the state of Pennsylvania, to check what was alleged to be misbranding and false and misleading advertising of the "Mr. Enzyme" product. On May 18, 1963, the state of Pennsylvania embargoed approximately 38 cases of "Mr. Enzyme." On May 27, 1963, the United States District Court for the Western District of Pennsylvania, pursuant to the federal Food and Drug Acts, ordered the seizure of 78 cases of the product. Seven days later the U.S. Marshal, accompanied by officials of the Food and Drug Administration, executed the seizure.

Immediately following the seizure, the manufacturer of "Mr. Enzyme" informed HMS that it would not make any further shipments of its product and that it was discontinuing all production. All advertising of the product ceased. On June 17 Norwich notified HMS that it would not continue further distribution. Norwich was replaced by the B. W. Mansfield Corporation, a small distributor with outlets only in California.

The financial condition of HMS continued to deteriorate. It was able neither to meet its liabilities nor to secure further bank loans. Its net sales for the last seven months of 1963 amounted to slightly in excess of $6,000. By the end of the same year, its accumulated deficit amounted to $227,531.80. Its net sales for the year 1964 amounted to approximately $8,000. In May 1964 HMS vacated its offices and the landlord seized its furniture and fixtures to secure back payment of rent. By June 1964 the company had no full time employees.

Benson was indicted on October 7, 1968. Count 1 of the indictment, upon which he was convicted, charged that he:

. . . unlawfully, wilfully and knowingly, in the offer and sale of securities, to wit, common stock of Home Makers Savings Corporation (hereinafter referred to as Home Makers), by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, . . . did (a) employ a device, scheme and artifice to defraud; (b) obtain money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engage in transactions, practices and a course of business which would and did operate as a fraud and deceit upon purchasers of said securities . . . .

The Government produced evidence which, if believed, showed that on various occasions in 1963 and early 1964 Benson called John Gillen, the alleged victim in Count 1, about the activities and prospects of HMS, and suggested that Gillen purchase HMS stock; that Gillen, although aware that the company was not making money at the time he purchased the HMS stock, was not advised that it had a deficit or that it could not meet its bills as they came due. Gillen's purchases were made on November 12, 1963, December 6, 1963, and February 25, 1964. There was also evidence, if believed, that Gillen was not informed of the FDA action against "Mr. Enzyme" and that not until after his last purchase did he learn that the product was under state and federal investigation; that it was not until late 1964 or early 1965, when he approached Benson to sell the stock, that Gillen first learned of the governmental embargoes of "Mr. Enzyme" and that "there was no market" in the stock. Gillen's testimony indicated that he made no independent investigation of the stock but relied upon Benson in making the purchases.

On this appeal, Benson alleges a number of trial errors, including:

1. Prejudicial remarks of the prosecutor in his summation to the jury;

2. Cross-examination of Benson as to determinations of administrative agencies not resulting in criminal conviction;

3. The introduction of expert testimony as to custom and usage in the securities industry; and

4. Violation of his rights to a speedy trial and to due process of law. Benson also complains that the evidence was insufficient to sustain the verdict and that the verdict was inconsistent and conjectural. After a careful review of the record and briefs, we affirm.

## I. THE PROSECUTION SUMMATION

In his peroration to the jury, the prosecutor stated:

> There is a quotation, I believe, of Oliver Wendell Holmes, that says the Government wins every case in which justice is done, and that is what I am standing here asking you for, to do justice, *but I know*, that to do justice, you *must return* a guilty verdict. [Emphasis supplied.]

Relying on our decision in United States v. Schartner, 426 F.2d 470 (3d Cir. 1970), Benson argues that this statement was reversible error because the remark was not based upon the evidence in the case but "rather directed the jury to rely on the prosecutor's personal knowledge in these affairs." He also contends that the tenor of the prosecutor's remarks implied that the jury would be derelict in the performance of its duty if it did not return a verdict of guilty.

Under the test laid down by this court in *Schartner*, the question is whether the remark can be fairly construed to refer to the prosecutor's personal belief based on the evidence or to his opinion

formed from facts not in evidence. The statement we held to be reversible error in *Schartner* referred, when fairly construed, to the Government attorney's general prosecutorial experience and his "sincerity," neither of which was part of the evidence in that case.[1] In this case, the prosecutor's remark was made at the conclusion of his summation after a detailed review of the evidence. Omitted, though fairly implied under these circumstances, were the words "on the evidence." So construed, the prosecutor's remarks referred not to his opinion from facts not in evidence but to his personal belief of evidence in the record.

As we only recently indicated, United States v. LeFevre, 483 F.2d 477 (3d Cir. 1973), even if based on the evidence, statements by counsel of their personal conviction of the merits of their client's cause should always be avoided. We have expressed our disapproval of such remarks by adopting Standard 5.8 (b) of the American Bar Association Standards Relating to the Prosecution Function.[2] We reiterate the position expressed in the ABA Standard and in *LeFevre*.

We have indicated, however, that if based on the evidence, prosecutorial comments on the guilt of the accused are not reversible error per se. United States v. LeFevre, *supra*. We recognize that:

> Trials are rarely, if ever, perfect and improprieties of argument by counsel to the jury do not call for a new trial unless they are so gross as probably to prejudice the defendant and the prejudice has not been neutralized by the trial judge before submission of the case to the jury.

United States v. Leftwich, 461 F.2d 586, 590 (3d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178 (1972).

---

1. The remark was as follows:
   I have a duty to protect the innocent and to see that the guilty do not escape. *I say to you with all the sincerity I can muster if you do not convict the defendant, the guilty will escape.* [Emphasis supplied.]

2. Standard 5.8(b) provides:
   It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

In the instant case, the trial judge took corrective action and charged the jury on a number of occasions that they were only to consider the evidence in the case. He instructed them that:

> In the exercise of your judgment, you must confine yourselves *exclusively* to *your* recollection of the testimony of the witnesses, plus your evaluation of the exhibits or the documentary evidence . . . .
>
> Statements and arguments of counsel are not evidence in the case unless made as an admission or stipulation of fact . . . . [Emphasis supplied.]

At a later point in his charge when the functions of counsel were discussed, he reiterated that:

> *The arguments of a lawyer are not evidence.* The function of the lawyer is to aid in the administration of a case by way of prosecution and defense and to clarify the issues of an action.
>
> If any counsel has argued to you on the facts in such a manner as may be contrary to, or different from, what you recollect the evidence to be, *it will be your own recollection of the evidence that you will abide by,* because, as I have told you, it is you and you only who are the judges of the facts in this case. [Emphasis supplied.]

■ Under these circumstances we do not believe that the single brief phrase of the prosecutor was "so gross" as to constitute prejudicial error.

## II. THE CROSS–EXAMINATION

Benson contends that it was reversible error to permit the Government to cross-examine him as to his involvement in proceedings before the National Association of Securities Dealers (NASD) and the Securities Exchange Commission (SEC). He was asked, inter alia, whether he had been found to have violated NASD rules by issuing misleading advertisements in relation to the HMS product and by selling stock at prices unreasonably related to the market. He was also questioned as to whether his SEC license and NASD membership were revoked. He argues that since the NASD and SEC proceedings, civil in nature, did not result in a conviction for crime, the cross-examination was impermissible.

■■ It is well settled that when a defendant takes the stand on his own behalf he is subject to full cross-examination. United States v. Lowe, 234 F.2d 919, 922 (3d Cir. 1956). This includes the right of the prosecution to cross-examine the defendant as to matters affecting his credibility as a witness. Particular acts of misconduct, when they result in a judgment of conviction, are clearly within the scope of this cross-examination. IIIA Wigmore, Evidence § 980 (Chadbourn Ed.1970); United States v. White, 446 F.2d 1280 (3d Cir. 1971). Benson is correct in maintaining that the determinations and findings of administrative agencies do not constitute "convictions" within the meaning of the above-stated rule. As Wigmore points out in discussing the propriety of using prior convictions for purposes of impeaching credibility:

> It should be understood by all courts that the only relevant circumstance is actual conduct, *i. e.,* the fact, not the mere charge of having misbehaved.

IIIA Wigmore, Evidence § 980a at 835–36 (Chadbourn Ed.1970). Judgment of conviction in a criminal proceeding insures that the fact of prior misconduct has been established by proof beyond a reasonable doubt. Administrative proceedings are civil in nature, the burden of proof is less rigorous and therefore the factual findings are less reliable. *See, e. g.,* Section 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d). The rule allowing cross-examination as to prior convictions for impeachment purposes should not be extended to include the findings of administrative agencies.

■ Notwithstanding that the cross-examination concerning the administrative proceedings was improper for im-

peachment as to prior convictions, the Government argues that the questioning was nevertheless permissible for three independent reasons. First, the Government maintains that the cross-examination was proper because Benson, in his direct testimony, put his character in issue. Second, the Government asserts that its cross-examination was permissible to show that the misconduct charged in the instant trial was not inadvertent, accidental, unintentional or without guilty knowledge. Third, the Government argues that Benson's testimony on direct examination "opened the door" to the prosecution's questioning on cross-examination. We need not discuss whether the cross-examination was proper on the first two grounds asserted by the Government for we find that the questioning was proper in light of Benson's testimony on direct examination.

In response to questions from his counsel, Benson testified concerning a complaint filed against him by the NASD and loss of his license and NASD membership. He testified that the attorney in the SEC hearings was a Mr. Milstein, an investigating officer for the SEC. Examination of the record reveals that Benson plainly implied the source of his problems was harassment by Milstein. Cross-examination of Benson to establish the existence of numerous other SEC proceedings to which Milstein was not a party was designed to rebut this inference. Under such circumstances, the cross-examination was proper as it was addressed to matters developed by Benson on direct. United States v. Lowe, *supra.*

## III. TESTIMONY RELATING TO CUSTOM AND USAGE

Benson maintains that the trial judge erred in allowing the prosecution to introduce over his timely objection expert testimony as to practices in the securities industry. He asserts that the testimony was prejudicial because it was introduced prematurely, before proof of corpus delictum, and because it was introduced to establish a criminal standard of disclosure in the sale of securities.

A review of the record reveals that early in the presentation of its case, the prosecution called Norbert H. Sickle as an expert witness to provide background information for the operation of the over-the-counter securities market. In his offer of proof, the prosecutor stated:

> I don't intend to ask him what is his opinion of Home Makers Savings stock. I will not ask any questions along that line, nor will I ask him whether or not Benson and Company was a good company and whether they violated any laws.

Mr. Sickle's testimony was brief and general. Although at one point he adverted to the obligation of disclosure by a broker soliciting an order,[3] the record negates the assertion that the evidence this witness presented was anything more than background information for the jury's understanding of the intricacies of the over-the-counter securities market.

In contrast, the cross-examination of Mr. Sickle was very broad, intensive and much beyond the scope of the direct examination. It involved an inquiry into the activities of wholly unrelated corpo-

---

3. Mr. Sickle testified on direct, inter alia, to the following:

Q. Would you make a distinction between an unsolicited and a solicited order?

A. Yes. There is a great burden on the broker when he is soliciting an order. There is a burden to give that customer as much information as he possibly can and know as much about that company as he possibly can.

When a customer, however, calls the broker unsolicited and places an order that the broker didn't solicit to buy a certain security, our moral obligation is very, very substantially reduced. We may know little or nothing of that company, but we are in a way a public service and we can't refuse the order, with certain exceptions, because the customer may know a lot more about that company than we do, and undoubtedly does, and he has his reasons for buying that stock and we would certainly not want to refuse to handle the order and perhaps cause him to lose a profit in so doing.

rations, apparently in an effort to anticipate a defense. In addition, the witness was interrogated about the NASD, its purpose, and its relationship to the SEC.

Sickle's cross-examination was followed by the testimony of several expert witnesses called by the defense. Their testimony largely concerned custom and usage in the industry regarding disclosure obligations to prospective stock purchasers. One witness testified extensively, including statements that the duty of a salesman making his initial sale to a customer was "to inform the customer of all the relevant facts at the command of the salesman" and to make a "full and complete disclosure." [4]

In discussing with counsel the substance of the expert testimony produced by the government and defense, the trial judge first stated:

> The Court: He [Sickle] only testified to background. Somebody on the defendant's side brought out custom and usage. Then the government brought out custom and usage.

> Mr. Geary [Counsel for appellant]: I disagree, your Honor. I thought that was in the offer of proof.

> The Court: No, that was not. The background was the thing that we specifically permitted Mr. Sickle to testify to, and then you fellows widened it out in cross-examination.

■ We believe that the trial judge did not commit any error in permitting Mr. Sickle to provide background information to the jury on the securities operation.

Benson offers no support for his assertion that the prosecution introduced custom and usage testimony to establish a criminal standard. A distillation of his argument reveals that his objection is actually directed to the testimony pertaining to the industry standard of disclosure to potential stock customers. Benson has not directed our attention to, and we have not been able to find, any statement in the record that the testimony of Mr. Sickle provided the criminal standard by which Benson's conduct was to be measured by the jury.

The defense, on the other hand, anticipating that it would call experts, expanded Mr. Sickle's testimony through cross-examination. Benson's expert witnesses also testified to the industry practice of disclosure and fixed what may be characterized as a standard of disclosure higher than that testified to by the Government's witness. Even if it were erroneous, we fail to perceive how Benson was harmed by the testimony of Mr. Sickle, particularly in light of the sweeping testimony of his own experts, and in light of the trial judge's instructions to the jury on the essential elements required to establish guilt under the statute.[5]

■ In this connection, the appellant also argues that the court erred in denying his request to the jury that "proof

---

4. The witness testified, inter alia:
 Q. In selling a speculative stock, what is the most important thing that a salesman must disclose to the customer?
 A. I think complete disclosure that it is a speculation and all pertinent information on it.

5. The trial judge did not advert in his charge to a criminal standard of disclosure established by custom and usage in the industry but charged the jury that:
 Section 77(q) thus presents three-fold prohibitions when coupled with the use of the United States mails or interstate transportation or communications:
 1. The intentional employment of a scheme, device or artifice to defraud in the offer to sell or the sale of a security; or,
 2. The intentional making or causing to be made of any misrepresentation of material facts in the offer to sell or the sale of a security; or,
 3. Any intentional omission of a material fact in connection with offer to sell or sale of a security.
 Proof beyond a reasonable doubt that a defendant violated any one of these prohibitions, when coupled with proof that either interstate transportation or communication or the United States mails were availed, is sufficient to establish a violation of this section of the Security Act.

of the 'corpus delicti' cannot be established by showing deviation from custom and usage." In view of the comprehensive charge on the elements necessary for the government to establish the commission of the crime, we find no error in refusing to make this charge as requested.

We have reviewed the additional evidentiary errors asserted by the appellant and the alleged prejudicial role of the trial judge and we find them without merit.

## IV. SPEEDY TRIAL

Benson also argues that a 34 month delay between December 1965, the time Benson asserts that the Government concluded that Benson & Company and Benson "violated and wilfully aided and abetted violations of Section 17(a) of the Securities Act of 1933" and October 1968, the date of his indictment, violated his sixth amendment right to a speedy trial and his fifth amendment right to due process of law.

The lengthy delay, Benson contends, caused his memory and that of his witnesses to suffer. Additionally, he complains that following the civil proceedings instituted against him by the SEC he and his family suffered many hardships including disruption of employment, public obloquy, and excessive financial pressures. He contends that the time which elapsed between the administrative determinations and the initiation of criminal proceedings was inordinate and amounted to bad faith, or at least negligence, on the part of the federal government.

█ We had occasion in United State v. Dukow, 453 F.2d 1328 (3d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972), to consider a similar contention. The defendants there urged that a 55 month delay between the initiation of public administrative proceedings and the date of the indictment and a 22 month delay from the referral of the case by the SEC to the Justice Department to the date of indictment violated their right to a speedy trial. In Dukow, we reviewed United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), relied upon by Benson in the present case. We concluded that the decision in Marion dispelled the validity of any argument that the sixth amendment speedy trial provision has any application until the putative defendant becomes an "accused." Here, Benson became an "accused" no earlier than October 7, 1968, the date of his indictment.[6] As Benson does not complain of unconstitutional delay between the time of his indictment and date of his trial, which began on January 19, 1970, Dukow controls and rebuts Benson's sixth amendment claim.

█ Turning to Benson's fifth amendment claim, we held in Dukow that under Marion the due process clause of the fifth amendment would require dismissal of the indictment if the defendant at trial could show that the pre-indictment delay caused substantial prejudice to his rights to a fair trial. The primary ground asserted by Benson for substantial prejudice in his right to a fair trial is failing memories of the defense. Loss of memory is nearly always a consequence of delay. We believe it is a sufficient answer in this case that Benson had available substantial information from the discovery procedures and from the material submitted to him in compliance with the Jencks Act. He also had the benefit of the transcript of the proceedings before the SEC and extensive documentary material and exhibits. Under these circumstances, we do not find that Benson's rights to due process of law have been violated.

We take note that the Government conducted its field investigation of the sales of HMS stock in January 1965. SEC hearings were held in September 1965 and a final hearing on January 16,

---

6. The indictment in this case was returned within the applicable period of the statute of limitations. 18 U.S.C. § 3282.

1967. The SEC made its criminal reference report to the Department of Justice in April 1968 and the Grand Jury returned its indictment on October 7, 1968. While a considerable period of time elapsed between the time the SEC conducted its first hearing and the criminal reference by the SEC to the Department of Justice, this appears to have been necessary because of the complexities of the case and the effort of the Government to protect the parties charged in the civil proceedings from improvident criminal proceedings.

## V. SUFFICIENCY OF THE EVIDENCE

 Benson also contends that the verdict is not supported by substantial evidence and it is contrary to the weight of the evidence. On appeal, the evidence and the inferences to be drawn must be taken in the light most favorable to the government. United States v. Goberman, 458 F.2d 226 (3d Cir. 1972).

In denying Benson's motion for new trial, the district court reviewed the evidence in this case at length. In finding that the guilty verdict was amply supported by substantial evidence, the court stated:

> [T]he defendant has, for the most part, ignored the large amount of testimony which was presented during the thirty-five days trial. But a reexamination of the Gillen testimony, alone, indicates that he testified that he had not been fully informed by the defendant Benson concerning the shares of stock which the defendant had sold him; that he was not informed that "Mr. Enzyme" was the only product being produced by Home Makers; that he was never made aware of any deficit of the company . . . that he did not know about the condemnation by the Government until after he had made the purchases; that he was urged by the defendant to buy more of that stock; that although he assumed Benson was an officer of the company, the defendant never made a full disclosure of his

connection with the company . . . that he relied on Benson who called him repeatedly urging him to buy more stock . . . and that he received all confirmations of his stock transactions through the mail.

We have reviewed the record of trial and we cannot say that the verdict is unsupported by substantial evidence or that it is contrary to the weight of the evidence. Nor do we find merit in any of the other contentions advanced by appellant.

The judgment of the district court will be affirmed.