UNITED STATES of America

v.

Augustine SALVITTI.

Crim. No. 77–467.

United States District Court,
E. D. Pennsylvania.

May 3, 1978.

As Amended May 5, 1978.

Alan M. Lieberman, Philadelphia, Pa., for plaintiff.

Robert E. Gabriel, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

The defendant, Augustine A. Salvitti, Executive Director of the Redevelopment Authority of the City of Philadelphia, has been found guilty by a jury of accepting a $27,500 bribe in connection with his official duties. He stands convicted of one count of conducting the affairs of an enterprise through a pattern of racketeering activity (the "RICO" statute), 18 U.S.C. § 1962; three counts of mail fraud, 18 U.S.C. § 1341; and one count of extortionate interference with interstate commerce (the "Hobbs Act"), 18 U.S.C. § 1951. The defendant now seeks a judgment of acquittal, or a new trial.

### I. THE FACTS

The evidence in support of the jury's verdict disclosed the following facts. Penrose Industries, a closely-held corporation controlled by one William Sylk, entered into a long-term lease with the Redevelopment Authority for a tract of land near the Phila-

delphia Airport, and built a large warehouse on the property. The lease included an option to purchase the tract upon favorable terms. Penrose Industries suffered financial reverses, and was unable to pay the rent. Eventually, the Redevelopment Authority terminated the lease and successfully pressed litigation in the state courts to evict Penrose and terminate its interests in the property. While an appeal from this decision was pending,[1] the then Mayor, James H. J. Tate, during the concluding weeks of his term of office, authorized a new contractual arrangement with the Penrose interests; the general effect of this document would have been to waive the earlier defaults, reinstate Penrose as a tenant, and reinstate the original option agreement. The execution of this new agreement by the parties named therein was under way when the new Mayor, Frank L. Rizzo, took office in January 1972, but it had not yet been signed by Philadelphia Industrial Development Corporation (PIDC) which was a mortgagee of the property and a named party in both sets of agreements. PIDC refused to sign the new arrangement and it was promptly repudiated both by Mayor Rizzo and by the City Council. Thus, at that point, the City had won at least the first round of an eviction proceeding, and had obtained a very large judgment against Penrose Industries for unpaid rent and failure to maintain the property; Penrose Industries had at least some lingering rights to assert equitable defenses to the original foreclosure action and, if the "Tate agreement" were upheld as valid and enforceable, Penrose Industries had a long-term lease with option to purchase (at a price which did not reflect the substantial increases in land values which had occurred in the interim). Meanwhile, the property was vacant, was producing no current income, and was providing no jobs for city residents.

Moreover, the pendency of these unresolved issues prevented the City agencies from disposing of the property elsewhere. And they were aware that one Jerome Heil-weil, owner of an enterprise known as Star Metals, Inc., was very anxious to acquire and occupy the tract; and that his firm, which was a substantial employer of local labor, would probably be forced to relocate outside of Philadelphia unless the Penrose tract could be made available to him.

It is clear that, during 1972 and 1973, efforts were being made at various levels to dispose of the Sylk/Penrose Industries claims through settlement. But there is sharp conflict in the testimony of various witnesses called by the Government, concerning who was in favor of, and who opposed to, a settlement of these claims. It is clear that Lynne Abraham, Esq. (now a judge of the Municipal Court of Philadelphia) selected by Mayor Rizzo to serve as Executive Director of the Redevelopment Authority, and who occupied the post of Executive Director from August 1972 to November 1973, was strongly opposed to making any payment to the Sylks, and that Isador Gottlieb, Esq., the RDA lawyer who had been handling the transaction throughout the entire period, and James Crawford, Esq., Ms. Abraham's choice as general counsel to the RDA, were of the view that the Sylk/Penrose claims were utterly lacking in merit. Eventually, these three individuals came to the view that, in order to extricate the Authority promptly from the legal snarl perhaps a settlement in the range of $100,-000 to $200,000 should be negotiated.

Judge Abraham testified that, throughout this period, she was constantly being pressured by Philip Carroll, the Deputy Mayor, to settle with the Sylk interests for between $400,000 and $800,000. She testified that Mr. Carroll told her that the Sylks were valued contributors to the Democratic Party, friendly to the Mayor; and that the Mayor contemplated running for Governor of the State, and needed all the friends he could get. She testified further that, when she complained to the Mayor about Mr. Carroll's pressure, and advised him that the proposed payment to the Sylks would be totally improper and probably illegal, the Mayor chided her for not being a "team

---

1. Indeed, the appeal may already have been dismissed for lack of prosecution.

player," and intimated that she should follow Mr. Carroll's suggestions with respect to the Sylk transaction. Both Mayor Rizzo and Deputy Mayor Carroll testified that no such pressure was exerted, and generally denied Judge Abraham's testimony and its implications. They both testified that Mayor Rizzo was at all times opposed to any settlement with the Sylks. Among other things, they pointed to the undisputed fact that, when the Mayor first learned that the Redevelopment Authority did settle with the Sylks in the fall of 1973, the Mayor issued blanket orders prohibiting the carrying out of the proposed settlement.

These conflicts in the testimony with respect to the correctness, desirability, and sponsorship of the settlement proposal have only marginal bearing upon the central issue in this case, namely, Mr. Salvitti's involvement in the alleged kickback scheme. Mr. Salvitti became a member of the Board of the Redevelopment Authority some time in 1973, apparently in about September of that year. He became Executive Director of the Redevelopment Authority in December of 1973. There is some evidence that he had been in communication with Mr. Heilweil and had visited his plant before becoming Executive Director, but he denied any such earlier contacts. Be that as it may, when Mr. Salvitti became Executive Director, all of the issues surrounding the Penrose property remained unresolved. The Government's theory of the case is that the defendant soon formed a plan to achieve a resolution of the impasse in a manner favorable to himself. Judge Abraham had been fired as Executive Director in November 1973, and Mr. Crawford, the general counsel, had announced his intention to resign in the near future (he actually departed in the spring of 1974). Mr. Gottlieb, the remaining principal obstacle to a generous settlement of the Sylk/Penrose claims, was in ill health. The defendant brought in a new lawyer, Peter Galante, Esq., to be "co-counsel" with Mr. Gottlieb in the Sylk transaction, preliminarily to naming Mr. Galante general counsel to the RDA. Shortly before Mr. Galante was appointed, the Sylk/Penrose interests had

filed a mandamus action in the state courts, seeking to enforce the "Tate agreement."

At about this same time, Mr. Salvitti signed, and later obtained Board approval of, an agreement to sell the disputed property to the Heilweil firm. This agreement contained rather onerous indemnification provisions protecting the purchaser against loss in the event the Sylk/Penrose interests succeeded in establishing their claims to the property. It is fair to state that this commitment to the Heilweil firm did not exactly weaken the bargaining power of Mr. Sylk. The evidence is conflicting as to whether the Mayor or Deputy Mayor had knowledge of the Heilweil agreement in advance of its approval by the RDA.

Meanwhile, in April or May of 1974, the defendant met with Mr. Sylk to discuss the settlement of the entire dispute, and suggested to Mr. Sylk that the transaction would proceed more smoothly if Mr. Sylk were to change lawyers. At the defendant's suggestion, Mr. Sylk retained Anthony Pirillo, Esq., a long-time friend of the defendant, to represent the Sylk/Penrose interests.

The defendant thereafter met with Mr. Pirillo, and advised him that he would shortly be "getting a call" from Mr. Sylk. Mr. Pirillo testified that he and the defendant had an understanding to the effect that Mr. Pirillo's counsel fee in the Sylk transaction would be shared with the defendant.

Initially, Mr. Galante was of the view that, while the RDA was in a reasonably strong bargaining position, it would be preferable to settle the dispute before entering into any other arrangements to dispose of the Penrose property; he estimated that a settlement in the range of $200,000 to $300,000 should be reasonable. When he first met with Mr. Pirillo to discuss settlement, he advised Mr. Pirillo that $200,000 would be the maximum offer. Mr. Pirillo rejected that figure as "ridiculous" and told Mr. Galante that he should check back with his client, because Mr. Pirillo was certain that Mr. Galante would have greater authority than that. Mr. Galante then conferred

with the defendant, who told him that Deputy Mayor Carroll had informed the defendant "that the City was willing to go between $350,000 and $840,000 in settlement of this case." Mr. Galante further testified:

"I asked him if he was sure about that and he said he certainly was, there was no question about it" (N.T. 179).

Mr. Galante then conferred at length with Mr. Gottlieb, and they eventually jointly decided that a settlement within that higher range would be in the best interests of the RDA and the City. A principal factor in Mr. Galante's re-evaluation of the transaction at the higher figure was the intervening event of the new agreement to sell the property to the Heilweil firm. Mr. Galante, who had nothing to do with the negotiation, drafting, or execution of the Heilweil agreement, felt that the RDA and the City would be "in a real bind" if the Sylk claim should ultimately be successful, because the RDA was required not only to pay back the full purchase price to Heilweil ($1.8 million) plus cost of repairs and moving expenses, but also to find an equivalent property as substitution for the Penrose tract, although it was generally agreed that there was no such alternative property available.

Mr. Galante and Mr. Pirillo thereupon negotiated further, and arrived at a settlement under which the Sylk interests were to receive $575,000 net, in exchange for release of all claims. The settlement agreement was executed as of August 29, 1974, and was ratified by the Board of the Redevelopment Authority at its meeting of September 18, 1974.

The settlement prompted much adverse comment in the press. Mayor Rizzo denounced the proposed settlement, and issued orders that it not be carried out. He directed the City Solicitor to make an investigation of the entire transaction. Thereupon, the City Solicitor worked out an arrangement to submit the proposed settlement to a panel of three arbitrators. The arbitrators promptly concluded that the settlement was fair and reasonable; under the terms of the arbitration submission, their decision was binding upon all parties. An unusual feature of the arbitration proceeding was that the arbitrators did not have the benefit of the views of anyone opposed to the settlement, or anyone involved in the litigation or in the negotiation of the settlement (e. g., Mr. Gottlieb, Mr. Crawford, Judge Abraham, or Mr. Bellinger [the City's Director of Commerce, who had always been opposed to the settlement]). The only witnesses were City Solicitor Albert, and Mr. Sylk.

Thereafter, the settlement was carried out, and Mr. Sylk was paid the $575,000. Because of some intervening litigation concerning tax liens, the actual distribution to Mr. Sylk was made in two installments. Mr. Pirillo received a portion of each payment, as his counsel fee.

The actual distribution of the settlement proceeds was quite involved. For present purposes, it suffices to state that on one occasion, Mr. Pirillo arranged to obtain $15,000 in cash, which was thereupon delivered to the defendant by a young lawyer associated with Mr. Pirillo. Essentially the same procedure was followed on the second occasion, at which time $12,500 was delivered in cash to the defendant.

## II. THE RICO COUNT

It is clear that the Redevelopment Authority was an enterprise engaged in interstate commerce, or whose activities affected interstate commerce, and that the defendant was an employee of RDA. There are only two substantial legal issues involved in this aspect of the case: Does the evidence establish a "pattern" of racketeering activities, and was the defendant conducting the affairs of the RDA "through" a pattern of such activities?

Addressing the latter question first, I believe the jury could rationally conclude that the receipt of a bribe in connection with his official duties is sufficiently related to the activities of the RDA as to come within the statutory language. The more difficult question is whether the evidence discloses the kind of "pattern" which Congress had in mind.

There can be little doubt that the evidence brings this case within the literal language of the statute. A "pattern" is defined as two or more acts of racketeering activity, and "racketeering" is defined to include both bribery and mail fraud. The jury was instructed that they must acquit the defendant on the RICO charge unless they concluded that he did receive the $27,500 bribe, and also was guilty of at least one count of mail fraud. It is clear that all of the mailings which gave rise to the mail fraud charges were in connection with the single scheme to obtain the $27,500 bribe. But it is equally clear that each act of mailing constitutes a separate offense, even though related to the same scheme to defraud. If this is so, there would seem to be no obstacle to treating each as a separate act of "racketeering" for purposes of the RICO statute.

■ While the question is a close one, I have concluded that a single, ongoing scheme to defraud by obtaining bribes or kickbacks, which involves a series of unlawful acts, can establish a "pattern" for purposes of RICO, and that it is not necessary to establish two or more totally independent criminal acts.

### III. THE MAIL FRAUD COUNTS

■ Contrary to the defendant's arguments, I am satisfied that the evidence amply supports the mail fraud convictions. The jury could properly find that the mails were used in carrying out the fraudulent scheme and that the defendant "caused" the mailings. The substitution of Mr. Pirillo as counsel for the Sylk interests was an essential part of the fraudulent scheme. Mailings by which Mr. Pirillo entered his appearance and directed distribution of the settlement proceeds, related directly to the fraudulent scheme. Thus, this case is readily distinguishable from *United States v. Tarnopol,* 561 F.2d 466 (3d Cir. 1977), relied upon by the defendant. In *Tarnopol,* the fraud consisted of falsifying the company's books by omitting certain sales, so as to create a "slush fund" with which to bribe disc jockeys. The victims of the scheme were the persons entitled to greater amounts of royalties, the listening public, and the Internal Revenue Service. The Court held that routine mailings of packing slips, in the normal course of business, by employees not connected with the later failure to record some of the sales evidenced by these packing slips, could not be deemed a mailing "for the purpose of executing" the scheme to defraud. All of the mailings in that case were routine and legitimate; moreover, they were totally independent of, and unnecessary to, the fraudulent scheme. In the present case, by contrast, Mr. Pirillo's entry of appearance was not a legitimate act, but was an integral part of the fraudulent scheme.

In *U. S. v. Klein,* 515 F.2d 751 (3d Cir. 1975), also relied upon by the defendant, the mail fraud conviction was reversed because of the insufficiency of the evidence to establish that the defendant was aware of, or a participant in, the fraudulent scheme. It furnishes no aid to the defendant in this case.

### IV. THE HOBBS ACT COUNT

The defendant argues that the evidence was insufficient, as a matter of law, to make out a violation of the Hobbs Act, because Mr. Sylk voluntarily paid the fee to Mr. Pirillo, because Mr. Pirillo may have initiated the arrangement to split the fee with the defendant, without any express request by the defendant to that effect, and because, according to the defendant, the defendant did not exert any influence concerning the amount of the settlement paid to Mr. Sylk. In my view, all of these contentions lack merit.

■ The jury could reasonably have found that, when the defendant advised Mr. Sylk to change lawyers, and suggested his friend, Mr. Pirillo as a suitable replacement; when Mr. Pirillo was presented as someone with good "connections" with the City administration; when Mr. Sylk agreed to pay Pirillo 20% of the amount of the settlement in excess of $200,000 on the express condition that that would be the total

fee, and that Mr. Sylk would not have to make any additional payments to City officials; and when Mr. Sylk was induced to pay a substantial additional sum ($10,000, plus 20% of the interest earned by the escrowed settlement proceeds) for Mr. Pirillo's services in connection with the arbitration proceeding, Mr. Sylk was acting upon the reasonable and well-founded belief that the payments would expedite a favorable outcome, and that unless he agreed to make these payments the officials handling the transaction for the Redevelopment Authority/City interests would carry out their official duties in a manner less likely to produce benefits for Mr. Sylk. It cannot be disputed that, if the defendant had directly told Mr. Sylk that the payment of a kickback would produce a satisfactory settlement, this would have been a "wrongful taking under color of official right" sufficient to make out a violation of the Hobbs Act. *U. S. v. Kenny*, 462 F.2d 1205 (3d Cir. 1972). In like vein, if the defendant had told Mr. Sylk that payments to other City officials would be necessary, and Mr. Sylk had acted upon that suggestion, the statute would clearly be violated. The only distinction between these hypothetical examples and the present case is that here the communications were more subtle. But the jury was justified in concluding that Mr. Sylk was willing to make a payoff, and believed that he was making a payoff, of one or more public officials in order to gain his ends, and that he was unlikely to succeed in his goal without making such payoff. In these circumstances, it is immaterial that the defendant made no direct demand, or that Mr. Sylk may not have fully appreciated the identity or identities of the person or persons being bribed.

▮ With respect to the question as to whether it was Mr. Pirillo or the defendant who originally mentioned having the defendant share in the fee, the following comments are appropriate: (1) Whether Mr. Pirillo or the defendant first put the matter into words is of little moment, if he was then merely expressing what was in the minds of both from the beginning, and the evidence leaves little doubt about that (Mr.

Pirillo seemed to regard it as a foregone conclusion; and the defendant seemed also to take it as a matter of course). (2) Even if the defendant had had no intention of asking for or receiving a share of the Pirillo fee, his acquiescence in that arrangement when Mr. Pirillo first suggested it, and his later acceptance of the fee, would suffice, in the circumstances of this case, to establish a Hobbs Act violation. One cannot create the impression that a kickback would be helpful, and thereafter receive the kickback, and successfully defend against a Hobbs Act charge by arguing that the original impression was erroneous, and the later decision to accept the payoff a mere afterthought. (3) The jury could properly conclude that the only rational explanation for the defendant's actions in placing Mr. Pirillo as Sylk's lawyer (itself a flagrant breach of the defendant's official duties) while concealing his involvement in that transition from his own lawyer and other City officials is that it was part of a preconceived scheme to obtain a kickback.

Finally, it is immaterial whether the defendant did or did not actually help produce a favorable outcome for Mr. Sylk; moreover, it is quite clear that he did. He set the stage for a satisfactory negotiation by injecting Mr. Pirillo into the situation. He greatly enhanced the need for a settlement by executing the Heilweil agreement and, whether alone or in conjunction with Mr. Carroll, he helped drive up the price by disclosing in advance the amount the City might be willing to pay.

I reject as frivolous the assertion that the amount of the settlement payable to Mr. Sylk was determined by the arbitration proceeding, as a separate and independent matter.

▮ In addition to contending that the defendant's conduct did not amount to "extortion" within the requirements of the Hobbs Act, the defendant also argues that the requisite impact upon interstate commerce was not established. Whether measured by the $93,500 paid to Mr. Pirillo, or the $27,500 portion thereof paid to the de-

fendant, or whether viewed from the perspective of the interstate activities of the Redevelopment Authority itself, the evidence established an actual impact upon interstate commerce. *See, U. S. v. Mazzei,* 521 F.2d 639, 642 (3d Cir. 1975). Moreover, only threatened effect need be shown. *U. S. v. Staszcuk,* 517 F.2d 53 (7th Cir. 1975).

## V. ADMISSIBILITY OF DECLARATIONS OF WILLIAM SYLK

William Sylk, the payor of the kickback, appeared before a Federal Grand Jury and denied under oath that any kickback had been paid, or that the defendant had anything to do with his retention of Mr. Pirillo. He thereafter returned to the Grand Jury, recanted his earlier falsehoods, and testified in conformity with the Government's theory of the case. He was then indicted for perjury, and entered a guilty plea to one count of perjury. He thereafter became ill, and died before the Salvitti trial commenced. This series of events generated some interesting evidentiary problems at the trial.

■ The Government did not seek to introduce Mr. Sylk's Grand Jury testimony, but was permitted to introduce the testimony of Mr. Sylk's son, Thomas Sylk, as to certain declarations made by William Sylk to him, concerning William Sylk's motives in retaining Mr. Pirillo as his lawyer, and his willingness to pay what he regarded as an unduly generous fee. Essentially, William Sylk explained to his son his desperate need for cash, and his philosophy, "When in Rome, do as the Romans do." I am satisfied that this evidence was properly admitted to establish William Sylk's "state of mind," which was relevant to the Hobbs Act count and to the bribery predicate of the RICO count; and that it was not barred by the hearsay rule. The limitations on the probative force of this evidence were explained to the jury, and it was emphasized that Mr. Sylk's declarations not only could not be considered as evidence of anything except his state of mind at the time, but also that his declarations did not even purport to suggest that the defendant was expected to be a recipient of the kickbacks.

It should also be mentioned that the declarations of William Sylk added little, if anything, to the Government's case, in light of the testimony of Thomas Sylk and others who testified from their own observations.

A second set of issues with respect to William Sylk's declarations arose in connection with the defendant's stated desire to impeach William Sylk's credibility. The defendant argues, first, that the evidence, even if normally admissible, should not have been received in view of the fact that the declarant was an admitted perjurer and otherwise an unreliable witness; second, that his unavailability for cross-examination made it impossible adequately to impeach his credibility; and third, that at the very least, the jury should have been made aware of all of the negative factors affecting William Sylk's credibility.

I was not, and am not, persuaded that the out-of-court declarations by William Sylk should have been excluded because of their inherent unreliability. But, notwithstanding the limited "state of mind" probative force of this evidence, the jury was confronted with the need to assess its credibility. The rulings made in the course of trial on these issues were to the following effect: The jury was instructed at length about the potential unreliability of evidence from a tainted source, and it was noted that, if Mr. Sylk's declarations accurately reflected his state of mind, he, as a participant in a dishonest and fraudulent arrangement, was a tainted source. Defense counsel was advised that he would be permitted, if he so desired, to further impeach William Sylk's credibility by bringing out his perjury conviction, but that if this course were followed, the Government would be permitted to show the relevant circumstances surrounding the perjury conviction (*i. e.,* that the perjury consisted of his earlier denial of involvement in the kickback scheme). Needless to say, the defense elected not to pursue the perjury matter before the jury.

I believe these rulings were fair to both sides, and were correct.

## VI. EVIDENCE OF OTHER WRONGDOING

The Government's evidence was to the effect that Alfonso Tumini, Esq., a young lawyer working for Mr. Pirillo, delivered $15,000 in cash in an envelope to the defendant on March 30, 1974, and an additional $12,500 in cash on or about May 6, 1974. The Government was also in possession of evidence that the defendant had earlier solicited, and accepted, a $5,000 cash bribe from two individuals named Ellick and Gerner, in connection with an unrelated zoning matter. Well in advance of trial, the Government furnished counsel for the defendant with copies of the statements of Messrs. Ellick and Gerner, advising him that they might be called as witnesses at trial.

The zoning bribe was allegedly solicited and accepted in April of 1973. At that time, the defendant was a member of the Board of the Parking Authority of the City of Philadelphia, but apparently had not yet become a member of the Board of the Redevelopment Authority, although the record is not crystal clear on that subject.[2]

There was no reference to the Ellick-Gerner zoning transaction in the Government's case in chief. The defendant took the stand in his own defense, in order to deny receipt of the $27,500 cash payments from Mr. Tumini. Defense counsel was obviously anxious to avoid opening the door to evidence concerning the zoning transaction, and therefore attempted carefully to limit his questioning of the defendant, but the defendant could not be restrained:

"Q. Did you ever receive an envelope with money in it at the Redevelopment Authority on or about March 30, 1976, from Mr. Tumini?

"A. I have never received the money with an envelope in it—rather an envelope with money in it on March 30, '76, '75, '74, '73. I have never received an envelope with money in it at the Redevelopment Authority from anyone, let alone Mr. Tumini.

"Q. How about on May 7, the next day, the next day, or the following day?

"A. No, sir.

"Q. '76?

"A. No, sir.

"Q. Did you ever receive any money from Anthony Pirillo?

"A. Yes, sir.

"Q. Would you explain to the jury under what circumstances you have received money from Anthony Pirillo?

"A. Mr. Pirillo would borrow money from me from time to time and pay me back sometimes."

The statement "I have never received . . . an envelope with money in it on March 30, '76, '75, '74, '73" was plainly intended by the defendant as a sweeping denial of having received illicit cash payments in any of those years. The denial was not limited, but merely made more specific, by the further statement, "I have never received an envelope with money in it at the Redevelopment Authority from anyone, let alone Mr. Tumini." This testimony, particularly in light of the defendant's demeanor and tone of voice in giving that answer, plainly sought to convey to the jury the information that the defendant was an honorable public servant who had never received a bribe.

The defendant's cross-examination by Government counsel proceeded, without objection, as follows:

During 1973, the offices of the Redevelopment Authority were located on the 11th Floor of City Hall Annex. Messrs. Ellick and Gerner testified that they discussed the zoning matter with the defendant at an office in City Hall Annex (which they had earlier described to the FBI as the 13th Floor of the One East Penn Square Building), although the actual payment of the $5,000 allegedly took place at the defendant's business office in another section of the City.

---

**2.** Judge Abraham testified that the defendant became a member of the Board of the Redevelopment Authority "some time in the summer months of '73" (N.T. 76). When asked when he became a member of the Board of the Redevelopment Authority, the defendant testified "I don't recall exactly, but I think it was September of '73" (N.T. 926); he also testified that he was not "with" the Redevelopment Authority in any capacity in May of 1973 (N.T. 924).

"Q. Have you ever received any money while you have held public office to exercise your influence?

"A. Are you asking me if I have ever taken a bribe?

"Q. Yes, sir.

"A. No, sir.

"Q. Have you ever solicited any money for the use of your influence with the city administration?

"A. No, sir.

"Q. Do you know an individual by the name of Martin Ellick?

"A. Yes, sir."

At that point, defense counsel objected when the Government sought to ask:

"Q. Didn't you solicit $5,000 from Mr. Ellick for . . . ."

The stated basis of the objection was that the questioning was prejudicial, and that the prejudice would outweigh the probative value. The objection was overruled, and the cross-examination proceeded as follows:

"Q. In the spring of 1973, didn't you solicit $5,000 from Mr. Ellick to effect a zoning change for him and Mr. George Gerner?

"A. No, sir.

"Q. Did you ever have a conversation with Mr. Ellick regarding a zoning change that he and Mr. Gerner needed?

"A. Yes, sir.

"Q. Do you know Mr. George Gerner?

"A. Yes, sir.

"Q. Did you help them with that zoning change, sir?

"A. No, sir."

Thereafter, in rebuttal, the Government was permitted to introduce the testimony of Messrs. Ellick and Gerner to the effect that the defendant had indeed solicited and accepted a $5,000 cash payment in April of 1973, for the use of his influence in connection with a zoning application. The evidence as a whole permitted the jury to find that, whereas the $5,000 payment was made on or about April 18, 1973, when the defendant was a member of the Board of the Parking Authority, the zoning transaction was still in progress thereafter, and that Messrs. Ellick and Gerner met with the defendant and discussed the transaction with him after he became associated with the Redevelopment Authority; indeed, that such discussions took place in the RDA offices. The defendant in surrebuttal, reiterated his denial of having solicited or received the zoning bribe, pointed out certain discrepancies in the accounts given by Messrs. Ellick and Gerner, and emphasized the fact (apparently conceded by the Government) that his purported signature on the zoning application papers was not in his handwriting.

■ I am satisfied that the defendant's testimony on direct examination opened the door to this evidence. *U. S. v. Benson,* 487 F.2d 978, 983 (3d Cir. 1973); *see* Federal Rule of Evidence 611. Admissibility of this evidence was within the discretion of the trial judge, and I believe that discretion was properly exercised, upon consideration of the probative force of the evidence, its potential for undue prejudice, and its impact upon the course of the trial. The zoning incident was related to the defendant's activities as an official of the City Government, was closely related in time to the events leading to the Indictment, and allegedly related to actions taken by the defendant after his appointment to the Board of the Redevelopment Authority. A defendant who makes categorical and sweeping denials of improprieties in an attempt to persuade the jury has no grounds for complaint when the prosecution challenges such denials.

Moreover, this occurred in a trial in which the defendant presented a large number of character witnesses who testified that he bore an excellent reputation for honesty and integrity.[3] I do not mean to suggest

3. Before the defendant took the stand, his counsel had announced that he had upwards of 75 character witnesses available, whereupon it was agreed that he would be permitted to present 15 witnesses and also inform the jury of the availability of the others. After the defendant's testimony, 24 character witnesses actually testified, 45 additional character wit-

that the evidence was admissible to impeach his reputation for veracity, or to impeach the testimony of the character witnesses (*see* Federal Rule of Evidence 608), but simply to point out that, in this setting, it would have been decidedly unfair to the Government to limit the cross-examination of the defendant on this issue, or to exclude the rebuttal testimony.

Needless to say, the jury was repeatedly cautioned that this evidence was limited to impeachment of the defendant's testimony and could not be considered for any other purpose.

In my opinion, the Court's rulings, both as to the scope of cross-examination and as to the admissibility of the rebuttal evidence, were correct, and were in accord with the teachings of such cases as *U. S. v. Benson, supra; U. S. v. Segal,* 534 F.2d 578, 582 (3d Cir. 1976); *U. S. v. Wright,* 542 F.2d 975 (7th Cir. 1976); *U. S. v. Conlin,* 551 F.2d 534 (2d Cir. 1977); and *U. S. v. McClintic,* 570 F.2d 685, 690 (8th Cir. 1978). Of these, all but the *Benson* case were decided after the effective date of the new Federal Rules of Evidence, and it is apparent that the law has not changed by virtue of the new Rules.

### VII.   CONCLUSION

The defendant's Motion for Judgment of Acquittal and for a New Trial must be denied.

nesses individually identified themselves on the record, and a large number of others, perhaps as many as 100, were present in the courtroom and acknowledged, by a show of hands, that they were prepared to testify to his good reputation.