**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter ANGELILLI, William Butler,
Donald Irish, and Donald Ribotsky,
Defendants-Appellants.**

**Nos. 1039 to 1042, Dockets
80–1431—80–1434.**

United States Court of Appeals,
Second Circuit.

Argued March 12, 1981.

Decided Sept. 4, 1981.

Rehearing and Rehearing In Banc
Denied Nov. 5, 1981.

Ronald G. Russo, Sp. Asst. U.S. Atty., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., E. D. N. Y., Brooklyn, N.Y., of counsel), for plaintiff-appellee.

Gilbert S. Rosenthal, New York City, for defendant-appellant Angelilli.

Charles Haydon, New York City, for defendant-appellant Butler.

William Sonenshine, Brooklyn, N.Y., for defendant-appellant Irish.

Irving Anolik, New York City, for defendant-appellant Ribotsky.

Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Peter Angelilli, William Butler, Donald Irish, and Donald Ribotsky appeal from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York, Jacob Mishler, Judge. The trial and convictions related to acts of defendants as Marshals of the Civil Court of the City of New York, in conducting fraudulent auctions of the property of judgment debtors in that court. All defendants were convicted of engaging in a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1962(c) (1976), of conspiring to violate RICO, in violation of 18 U.S.C. § 1962(d) (1976), and of extortion under "color of official right" in violation of the Hobbs Acts, 18 U.S.C. § 1951 (1976). In addition, Butler, Irish, and Ribotsky were convicted of using the mails to further a scheme to defraud in violation of the mail fraud statute, 18 U.S.C. § 1341 (1976); Angelilli was acquitted on the mail fraud charge, although the judgment as to him mistakenly states that he was convicted on this charge as well. Each defendant was sentenced to concurrent periods of incarceration of one year and one day on each count. Execution of the sentences has been stayed pending this appeal.

For the reasons below, we affirm the convictions.

1. The marshals' duties also include executing commercial and residential evictions and sending out collection letters on unsatisfied judgments. There was testimony at trial that some marshals concentrated in these areas and did not execute on property.

2. Marshals are paid neither salary nor expenses. Their lawful compensation comes solely from fees as allowed by statute, deducted from the proceeds of the sales of debtors' property.

## FACTS

Defendants were four of the approximately eighty New York City marshals appointed by the Mayor of the City of New York as officers of the City's Civil Court, who are empowered, inter alia, to enforce judgments issued by that court. As part of the enforcement function, each marshal, upon request of a Civil Court judgment creditor, may levy upon and sell at publicly advertised auctions the property of a Civil Court judgment debtor.[1] The auctions are conducted either by the marshal himself or by an auctioneer hired by the marshal. After a sale the marshal is entitled to deduct certain statutorily authorized fees[2] and must remit the remainder of the proceeds, up to the amount of the judgment, to the attorney for the judgment creditor; any proceeds in excess of the judgment debt and statutory fees are to be remitted to the judgment debtor.

In 1976 an investigation was begun into the bona fides of the marshals' auction sales. New York City Department of Investigation Detective Edward Gruskin assumed an undercover identity and began attending auction sales as a cash buyer. The investigation culminated in a 25-count indictment in 1978 against eleven marshals, including the four appellants, and two auctioneers for various violations of federal law on account of sales of debtors' property at artificially deflated prices. Seven of the marshals and both auctioneers pleaded guilty to certain offenses,[3] leaving only Angelilli, Butler, Irish, and Ribotsky to be tried. Each of the four defendants was charged in four counts: (1) participating in the affairs of the Civil Court through a

3. In addition, five auctioneers who were not named in the indictment but were among those later identified by the government as unnamed coconspirators pleaded guilty to charges relating to these activities; and one similarly identified auctioneer was convicted, following a jury trial, of obstructing justice by giving false and evasive answers to the grand jury investigating these activities. See United States v. Kanovsky, 618 F.2d 229 (2d Cir. 1980).

pattern of racketeering (RICO § 1962(c)); (2) conspiring to so participate (RICO § 1962(d)); (3) extortion under color of official right; and (4) mail fraud. The indictment alleged that the pattern of racketeering activity included multiple acts of extortion and mail fraud; as the case went to the jury the indictment alleged with specificity ten extortionate transactions and five fraudulent mailings by Angelilli, eight extortionate transactions and four fraudulent mailings by Butler, nine extortionate transactions and four fraudulent mailings by Irish, and four extortionate transactions and three fraudulent mailings by Ribotsky. The conspiracy count charged a conspiracy among the four defendants, nine named but unindicted coconspirators, and certain unnamed coconspirators; pretrial disclosure by the government revealed the names of twenty-nine persons in the last category.

## A. The Prosecution's Evidence

Since only limited attacks are made on the sufficiency of the evidence produced at the five-week, 57-witness trial, a summary will suffice here. The prosecution's evidence consisted principally of the testimony of one of the former marshals who had been indicted and had pleaded guilty to a misdemeanor, the testimony of Detective Gruskin, together with certain tape recordings made by him of conversations at various auctions, and the testimony of about a dozen buyers, several of whom had also been auctioneers for various marshals including one or more of the defendants and all of whom were alleged to have been coconspirators. The witnesses presented the following picture.

Two groups of persons were aligned in the auction frauds: the marshals, acting either directly or through their auctioneers, and a group of 20–30 buyers, known by those who frequented the marshals' sales as "the boys." "The boys," who regularly attended the sales, were also referred to by the marshals as "the 40 thieves." Usually one or more of the "the boys" would meet prior to the auction with the marshal who had advertised the auction; they would agree at that time on a deflated price at which the property would ostensibly be sold, and on an amount over the ostensible sales price that "the boys" would pay to the marshal. The latter amount was known as "top money" or "money on top." Sometimes the amount of top money paid was greater than the amount paid at the sham auction.

"The boys" acted in two ways to keep the bidding within the bounds agreed on with the marshals. First, they acted as a coordinated group at the auction to eliminate competitive bidding among themselves at that stage. This united action was called a "kipper." Second, "the boys" attempted in various ways to discourage outsiders from bidding on the property. These methods consisted principally of misrepresentations as to the existence of liens on the property to be auctioned. After a sham auction "the boys" would hold their own private auction, called a "knockout," at which the property might be sold for as much as twice the amount paid at the marshal's auction. The starting price in the knockout was the total of the sham auction price plus the top money, and the difference between this total and the final knockout price was distributed by the knockout winner to the rest of "the boys." The bids at the knockout often were made in terms of so many dollars per participant rather than in terms of a total price.

Following the marshal's auction, the marshal would send a check to the attorney for the judgment creditor, purporting to represent the price at which the property had been sold at the auction. Needless to say, the checks did not include the "top money" received by the marshal. Butler, Irish, and Ribotsky stipulated that, as to each of the alleged fraudulent mailings attributed to them in the indictment, the checks were sent through the United States mails to attorneys for judgment creditors who regularly did business in interstate commerce.

Detective Gruskin and each of the buyers and auctioneers who testified provided considerable detail as to auctions at which marshals demanded top money. There was evi-

dence as to thirty such transactions which were listed in the indictment as incidents of substantive violations of law; and there was testimony as to some sixteen other transactions, admitted as evidence of other overt acts in furtherance of the conspiracy.

In addition, there was evidence that the practice of demanding top money was pervasive among those marshals who engaged in property executions. All seven of the auctioneers who testified admitted that they had demanded and received top money on behalf of the marshals for whom they conducted auctions, who included not only the four defendants but many other alleged coconspirators. Manuel Ortiz, the former marshal who testified, also admitted having demanded top money. He and all of the buyers and auctioneers testified that it was the custom and practice among marshals at auctions to demand top money. Many of the buyers stated that they had learned about top money at the first marshal's sale they attended; some testified that they had heard about the practice long before, from their fathers who were auctioneers. Ortiz described the practice as a common topic of conversation among marshals on the occasions of their monthly Marshals' Association meetings or whenever they would get together. He testified that he had discussed the practice with many marshals, including the four defendants on many occasions, and that experienced marshals routinely "educated" newly appointed marshals on the practice.[4] He himself had educated Butler,

---

4. Ortiz testified in part as follows:

Q Was there a custom and practice in the industry during the years you were a Marshal, namely, from '71 to '78 of a Marshal being paid money on top?
A Yes, sir.
Q And did you personally engage in that conduct?
A Yes.
Q And can you tell us how often you did that, sir?
A For the past three and a half years as a Marshal, I used to conduct sales on a weekly basis, but they would show up every two weeks at my sales.
Q When you say they—
A The 40 thieves.
Q And on those occasions, did you take money on top?
A Yes.
Q Now, did there come a time, sir, that you had conversations with any other Marshal with respect to that practice of taking money on top?
A Yes, I did.
Q And can you tell us, sir, who the other Marshals were that discussed this custom and practice with you?
A You could start out with Pete, Bill, Don.
Q Would you identify them by full names? When you say Pete, who do you mean?
Mr. Rosenthal: Identification conceded.
A With Butler, Don Irish and Don Ribotsky.
Q And you discussed that practice with these individuals?
A Yes, once in a while.
Q Who else did you discuss it with at—
A Lester Kasper, George Rivera, various other Marshals.
The Court: Where would you discuss these matters?

The Witness: At—we used to hold a meeting of the Marshal's [sic] Association at least once a month and downstairs in the lounge, we'd get to together before the meeting and talk about things that went on.
(Tr. 2142–43.)
Q Did there come a time that you did have a conversation with Mr. Ribotsky about this practice?
A Yes.

     *     *     *     *     *     *

Q On that occasion, sir, what did Mr. Ribotsky say to you and what did you say in return?
A He asked me to use Robert Rappaport as an auctioneer for my sales.
Q Did he indicate why he was using him?
A I would get a better break from hikm [sic] with respect to top money.
Q Did he indicate whether he was using Mr. Rappaport at that time?
A I believe he was.
Q When you [s]ay you'd get a better break with respect to top money, was anything further said by Marshal Ribotsky at that time?
A I don't recall.
Q At this time you were a new marshal, is that correct?
A Yes.
Q Did you have similar conversations with marshals other than Mr. Ribotsky and Mr. Kasper?
A Yes.
Q Who did you have those conversations with?
A I had them with—with respect to using auctioneers?
Q Yes.
A With Peter Angellili [sic], Don, and Bill Butler and Karic.

who had asked how to go about getting money on top.[5]

## B. *The Defense Case*

The defendants called some three dozen witnesses to refute the charges against them. Butler testified in his own behalf, denying that he had ever accepted any "top money," and indeed denying that he had ever heard the term before the commencement of trial. Irish testified to the same effect, and added that he was hard of hearing. Angelilli did not testify, but called twelve witnesses who stated that they nev-

Q Any other marshal that you spoke to, sir?
A Rivera Ponte, all the marshals that handle executions.
Q Do you recall at the time you had the conversation with Mr. Butler what was said?
A With Mr. Butler?
Q Yes.
A Well, Mr. Butler took over my office so I had to go over all the procedures with him.
Q When you say the procedures, did you go over the regulations?
A Over the regulations and how the operation of the office was to take place.
Q Did you have any conversation with him about using an auctioneer?
A Yes.
Q Can you tell us what you said to him and he said to you?
A At that time I told him to use Walter Jacobson, that he would get a fair shake.
Q Did you explain to Mr. Butler the purpose of using the auctioneer?
A Yes. You use the auctioneer to put a buffer between you and any ensuing investigation that comes up because the auctionner [*sic*] is the one that deals with these buyers. (Tr. 2146–48.)
Q During the time frame you were a marshal can you describe the custom and practice that was engaged in with respect to money on top?
What happens at sales?
A You would advertise the [s]ale, and the buyers would show up, they would come in and they would look at the merchandise and if they liked it they would come over to you and sometimes they would tell you what they would give you and how much top money they'd give you.
If they didn't like it they'd say, all you have is crap over here and we'll only give you so much, take it or leave it.
Sometimes if we knew the merchandise was pretty good we'd approach them and say we w[an]t so much for this and then we'd sell it, the hammer would come down at that particular price.
Q At a pre-agreed price?
A Yes.
Q Were there occasions where the auctioneer handled the entire deal for you?
A Yes.
Q On those occasions did you have anything to do with the men you referred to as the 40 theives [*sic*]?
A All I had to do w[i]th them is convey my prices to the auctioneer and maybe he would go outside and give it to them.
Q And was it the custom and practice that the auctioneer would return to the marshal and explain as to whether it had been agreed to?
A Yes, agreed or disagreed.
Q And following the agreement then the auction would be conducted?
A Yes.
Q You as a marshal would be advised what the deal was?
A Yes.
Q And you ultimately approved the sale going forward?
A Yes.
(Tr. 2149–50.)

5. Q I believe you told us you got to know Marshal Butler for the first time in 1974 or '75?
A Yes.
Q Is that right?
A 1974.
Q Let us start with 1974.
A Okay.
Q All right.
What is the first time at a marshals' meeting that you recall discussing top money in the presence of or with Marshal Butler?
A The first time?
Q Yes.
A Exact date?
Q No. Approximate date will do. Some time in what, '74, was it?
A '74 or '75 when I discussed it with Marshal Butler.
Q That was discussed at a Marshal's [*sic*] meeting; is that right?
A That's correct.
Q And you said to him, you know there is such a thing as top money; is that right? Is that what you said?
A No. It was common knowledge with all the Marshals, that this was going on.
Q Well, what was discussed if that was common knowledge?
A He wanted to know how you went about it.
Q Marshal Butler sometime in '74 or '75 asked you how to go about dealing in top money; is that right?
A That's right.
(Tr. 2216–18.)

er noticed any unlawful goings-on, and that the prices paid at Angelilli's auctions were fair. Ribotsky (who also did not testify), Butler, and Irish called a total of twenty-one witnesses who testified to their respective good character.

### C. The Verdicts

The jury was asked to return a general verdict as to each of the defendants on each count. In addition, as to each specific transaction or mailing alleged under the racketeering, extortion, and mail fraud counts, the jury was asked to state specifically whether or not it was proved beyond a reasonable doubt.

The jury found Butler, Irish, and Ribotsky guilty on all four counts. It found Angelilli guilty on the two RICO counts and the extortion count, but acquitted him of the mail fraud count. With respect to the individual transactions alleged, the jury found as follows: as to Angelilli, six out of the ten alleged extortionate transactions were proved, and none of the five alleged mail fraud transactions was proved; as to Butler, six of the eight alleged extortionate transactions and all four alleged mail frauds were proved; as to Irish all nine alleged extortionate transactions and all four alleged mail frauds were proved; and as to Ribotsky, three of the four alleged extortionate transactions and all three alleged mail frauds were proved.

### DISCUSSION

■ On appeal defendants make numerous challenges to their convictions. Chief among these are the contentions (1)

that the RICO statute does not apply to the activities of officials of the New York City Civil Court, (2) that their activities had insufficient impact on interstate commerce to trigger application of RICO or the Hobbs Act, (3) that their uses of the mails were not for the purpose of defrauding within the meaning of the mail fraud statute, and (4) that the admission of evidence as to the custom and practice of City marshals to demand top money was error.[6] We find no merit in the first three contentions. As to the fourth we conclude, on the basis of the record as a whole, that any error regarding the admission of the challenged testimony was not prejudicial.

### A. The Civil Court as a RICO Enterprise

■ RICO § 1962(c) provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "Enterprise," as used in § 1962(c) is defined as follows:

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity; . . . .

18 U.S.C. § 1961(4). The enterprise in whose activities defendants are alleged to have participated through a pattern of

---

**6.** We have examined all of defendants' contentions and find them unpersuasive. The contention that the recitation in the indictment of several acts of extortion or several acts of mail fraud in a single count was impermissibly duplicitous, was waived, *United States v. Viserto*, 596 F.2d 531, 538 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979), and is in any event lacking in merit since no prejudice has been shown, *see United States v. Murray*, 618 F.2d 892, 896–97 (2d Cir. 1980). Ribotsky's contention that a cassette recording of a particular transaction was played for the jury during its deliberations although the cas-

sette had not been admitted into evidence may be technically correct, but any error was clearly harmless. The recording played for the jury was a copy of a tape that had been admitted into evidence, the transcript of which had also been admitted into evidence; Ribotsky has pointed to no significant differences between the admitted tape and the cassette copy. Finally, given the many witnesses who testified to Ribotsky's receipt of top money, Ribotsky's arguments that he was merely a peripheral defendant whose case should have been severed, and that there was insufficient evidence to convict him, are frivolous.

racketeering,[7] is the New York City Civil Court. Defendants contend that governmental units such as the Civil Court are not enterprises within the meaning of RICO.[8] We disagree.

We begin with the language of the statute. On its face, the definition of "enterprise" is quite broad. We see no sign of an intention by Congress to exclude governmental units from its scope, cf. United States v. Turkette, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (construing "enterprise" to include illegal as well as legitimate ventures), and we note three pertinent aspects of the definition that suggest an expansive rather than a restrictive thrust. First, the term "enterprise" is defined to "include[ ]" the entities listed thereafter. The use of the word "includes," rather than a more restrictive term such as "means," "indicates that the list is not exhaustive but merely illustrative." United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); United States v. Thevis, 474 F.Supp. 134, 138 (N.D.Ga. 1979). See also 2A C. Sands, Sutherland on Statutes and Statutory Construction 82 (4th ed. 1973) ("A term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what a term 'means' "). Second, the use of the word "any" indicates an intent to make the list all-inclusive. The inclusion of "any individual," "any . . . partnership," "any . . . corporation," and so forth, belies an intention to distinguish, for example, between individuals having differing statuses, or between general and limited partnerships, or between business and municipal corporations. Finally, the word "entity" itself is hardly restrictive. It denotes anything that exists. As modified by the word "legal," it suggests that any being whose existence is recognized by law is within the term "enterprise." We conclude that on its face the definition of an enterprise to "include[ ] any . . . legal entity" is unambiguously broad, and that it does not exclude the Civil Court.[9]

This conclusion is bolstered by certain of RICO's substantive goals, which appear to be directed particularly toward governmental entities. For example, "racketeering activity" is defined in § 1961(1) to include bribery, obstruction of justice, and obstruction of State or local law enforcement. The administration of justice and the enforcement of the law are obviously governmental functions, and bribery is "a crime which is peculiar to public officials, including judges." United States v. Vignola, 464 F.Supp. 1091, 1096 n.12 (E.D.Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979) (table), cert. denied, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980). Section 1961(1) also includes reference to the Hobbs Act, 18 U.S.C. § 1951,

---

**7.** A "pattern of racketeering activity" consists of at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts include any act or threat of murder, kidnaping, gambling, arson, robbery, bribery, extortion, or narcotics dealing, which is punishable under state law by imprisonment for more than one year, and include any of a large number of violations of federal statutes including the Hobbs Act and the mail fraud statute.

**8.** Defendants argue also that RICO does not apply because the activities of the Civil Court, which is an instrumentality of the City of New York, lack the requisite impact on interstate commerce. Under § 1962(c) the activities of the enterprise need only "affect" interstate commerce, and even a slight effect will suffice. See, e. g., United States v. Barton, 647 F.2d 224, 233 (2d Cir. 1981), and cases cited therein; United States v. Mannino, 635 F.2d 110 (2d Cir. 1980). In the present case this requirement is easily satisfied by the fact, stipulated by all defendants, that "individuals and corporations who regularly engage in interstate commerce, appear as litigants in the Civil Court of the City of New York."

**9.** We find no merit in defendants' argument that because RICO contains a definition of "State," 18 U.S.C. § 1961(2), the definition of "enterprise" excludes states and their instrumentalities because it does not specifically refer to states. The conclusion does not follow from the premise. If one definition is broad enough to overlap part of another, specific reference is pro tanto unnecessary. There obviously is some overlap among the definitions, and no effort to cross-reference. For example, "person" is defined to "include[ ] any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3); the definition of enterprise refers to individuals and entities, although not to persons.

which prohibits extortion "under color of official right." Extortion under color of law is a crime which "can only be committed in the context of governmental activity." *United States v. Sisk*, 476 F.Supp. 1061, 1062 (M.D.Tenn.1979):

> At common law and under most statutes, bribery is limited to a payment given in exchange for the exercise of governmental power. Extortion under color of law is the use of governmental power to force an involuntary payment from another. By making bribery and extortion RICO offenses, Congress must be said to have understood that these offenses would be committed by governmental officials as a part of their work. Since these offenses can only be committed in the context of the work of a governmental agency, Congress must be taken to have intended that a governmental agency could be one of the types of "enterprises," the affairs of which are conducted through a pattern of racketeering offenses. The connection between the named offenses of bribery and extortion and governmental work is too close to say that government work is not one of the kinds of activity that may constitute a RICO "enterprise."

*Id.*

Our interpretation of the language of the statute to extend to activities affecting governmental entities is further supported by the purpose and legislative history of the Organized Crime Control Act of 1970 (the "Act"), Pub.L.No. 91–452, 84 Stat. 922, of which RICO is Title IX. The overriding purpose of the Act, as reflected in Congress's Statement of Findings and Purpose, was to deal with a widespread problem— the infiltration of organized crime into all areas of American life. While Congress was concerned principally with the relationship of crime to legitimate businesses, it does not appear that it intended to exclude the public sector from its assessment of the problem or its search for a cure:

> The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by un-lawful conduct and the illegal use of force, fraud, *and corruption*; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and *to subvert and corrupt our democratic processes*; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, *threaten the domestic security, and undermine the general welfare of the Nation and its citizens*; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

> It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

84 Stat. 922–23 (emphasis added). Congress's concern about the infiltration of local governmental units had surfaced repeatedly in the debates on portions of the Act other than the RICO title. *See* comments in the Senate, *e. g.*: "More important, these criminals have, in some localities, established corrupt alliances within the processes of our democratic society: with the police, prosecutors, courts, and legisla-

tures." 116 Cong.Rec. 586 (remarks of Sen. McClellan); "East of the Mississippi, particularly, it is the rare big-city government that is completely free of the fix." 116 Cong.Rec. 596 (reprinting *Time Magazine* cover story of August 22, 1969); "Corrupt officials and bribed law enforcement officers operate as 'a silent conspiracy' in support of organized crime. The syndicate could not continue to operate without corrupt judges and prosecutors, or without the assistance of a handful of bribed police." 116 Cong.Rec. 601 (remarks of Sen. Hruska); *see also* Senate Judiciary Committee Report's discussion of Title VIII of the Act, the provisions aimed at syndicated gambling: "Finally, Congress finds that corruption and bribery of State and local officials responsible for enforcement of criminal laws facilitate illegal gambling enterprises." S.Rep.No.617, 91st Cong., 1st Sess. 73 (1969). Similar views were aired in the House of Representatives, *e. g.*: the Act "places in the hands of the prosecution a number of necessary weapons in order to deal with the sophisticated operations of organized crime—including its connections with many public officials." 116 Cong.Rec. 35203 (remarks of Rep. McClory); "organized crime teaches the lesson that the law is for sale and that the road to success is to follow the path of corruption." 116 Cong. Rec. 35216 (remarks of Rep. McDade). Although the congressional discussion devoted expressly to Title IX did not state that governmental entities were to be the beneficiaries of RICO's substantive provisions, neither was there any statement that those entities were to be excepted. And of the three titles of the Act that create substantive offenses, RICO manifestly has the greatest substantive scope, and hence the greatest potential for dealing with corruption: the other two titles deal solely with illegal gambling activities (Title VIII), and with the importation, distribution, and storage of explosive devices (Title XI).

■ In sum, we view the language of § 1961(4), defining enterprise, as unambiguously encompassing governmental units, and we consider that the purpose and history of the Act and the substance of RICO's provisions demonstrate a clear congressional intent that RICO be interpreted to apply to activities that corrupt public or governmental entities. We note that this view is shared by virtually every other court that has considered the question. *See, e. g., United States v. Altomare,* 625 F.2d 5, 7–8 (4th Cir. 1980) (county prosecutor's office); *United States v. Karas,* 624 F.2d 500, 504 (4th Cir. 1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981) (county law enforcement officials); *United States v. Whitehead,* 618 F.2d 523 (4th Cir. 1980) (County Attorney); *United States v. Baker,* 617 F.2d 1060, 1061 (4th Cir. 1980) (county sheriff's department); *United States v. Grzywacz,* 603 F.2d 682, 685–87 (7th Cir. 1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (police department); *United States v. Frumento,* 563 F.2d 1083, 1089–92 (3d Cir. 1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978) (Pennsylvania Bureau of Cigarette and Beverage Taxes); *United States v. Brown,* 555 F.2d 407, 415–16 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (police department); *United States v. Sisk, supra,* 476 F.Supp. at 1062 (state governor's office); *United States v. Salvitti,* 451 F.Supp. 195, 199 (E.D.Pa.), *aff'd,* 588 F.2d 824 (3d Cir. 1978) (table) (Redevelopment Authority of the City of Philadelphia); *United States v. Vignola, supra,* 464 F.Supp. at 1095–98 (Philadelphia Traffic Court).[10]

---

**10.** The only contrary decision of which we are aware is *United States v. Mandel,* 415 F.Supp. 997 (D.Md.1976) *("Mandel"),* aff'd *on other grounds en banc by an equally divided court,* 602 F.2d 653 (4th Cir. 1979), in which the district court dismissed a count of an indictment on the ground that a state could not be a RICO enterprise. The government did not appeal the dismissal of that count. Subsequently, however, in *United States v. Baker, supra,* the Fourth Circuit specifically rejected the view of the district court in *Mandel.* The district court's decision in *Mandel* was relied on in the dissenting opinion in *United States v. Grzywacz, supra,* which contended that a police department could not be a RICO enterprise. The defendants here rely on the latter opinion and *Mandel* in arguing that the principle of

We find no merit in defendants' argument that the introduction in RICO of civil remedies such as divestiture and forfeiture of the defendant's interests in an enterprise compel the conclusion that governmental entities are not enterprises within the meaning of RICO. The fact that a convicted official will have no forfeitable property interest in a governmental unit does not suggest that that unit cannot be a RICO enterprise. As the Supreme Court stated recently in *United States v. Turkette, supra*, in rejecting a similar challenge to the inclusion of unlawful activities as RICO enterprises,

> [e]ven if one or more of the civil remedies might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept. Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions.

—— U.S. at ——, 101 S.Ct. at 2530 (footnote omitted). To the extent that the remedy of forfeiture might be invoked to remove a defendant from his official position, we do not see its application as impermissibly altering sensitive federal-state relationships, by "displac[ing] the State's freedom to structure integral operations in areas of traditional governmental functions." *National League of Cities v. Usery*, 426 U.S.

833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976). "In most instances, the issue would be moot since convicted felons are usually removed from office automatically." Atkinson, *"Racketeer Influenced and Corrupt Organizations," 18 U.S.C. §§ 1961–68: Broadest of the Federal Criminal Statutes*, 69 J. of Crim. Law & Criminology 1, 13 n.108 (1978).

Nor do we find persuasive the argument that if the term "enterprise" is broad enough to include the New York Civil Court it would also be broad enough to include a federal court or other federal agencies, and that such a result could not have been intended in view of the many provisions in the Criminal Code dealing with corruption of federal officials. The existence of other provisions is not a persuasive argument for construing "enterprise" so narrowly. RICO was not intended to supplant these provisions. Section 904(b) of Title IX, 84 Stat. 947, provides that

> [n]othing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title.

RICO contemplates an overlap with other provisions of the Criminal Code. An essential element of a RICO violation is the commission of two or more predicate acts, all of which are crimes under state or feder-

---

*ejusdem generis* requires an interpretation of "enterprise" that excludes governmental bodies. They argue that since the phrase "or other legal entity" is preceded by "individual, partnership, corporation, [or] association," the term "legal entity" must be deemed limited to one of "the common legal forms in which business entities and labor groups fashion themselves to carry out their private function." *United States v. Grzywacz, supra*, 603 F.2d at 691 (dissenting opinion), quoting *Mandel, supra*, 415 F.Supp. at 1021. We find this argument unpersuasive since we believe the congressional intent appears clearly to the contrary. "The rule of *ejusdem generis* is no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute." *United States v. Turkette, supra*, —— U.S. at ——, 101 S.Ct. at 2528. It is

> a useful tool of construction resorted to in ascertaining legislative intent. The rule

should not be employed when the intention of the legislature is otherwise evident . . . . Nor should it be applied to defeat the obvious purpose of the statute or to narrow the targets of Congressional concern.

*United States v. Frumento, supra*, 563 F.2d at 1090.

For a similar reason we reject defendants' argument that the "principle of lenity" requires an interpretation that excludes governmental entities. The principle of lenity, like *ejusdem generis*, applies only where the statute is ambiguous. *United States v. Turkette, supra*:

> There being no ambiguity in the RICO provisions at issue here, the rule of lenity does not come into play. . . . ("The canon in favor of strict construction [of criminal statutes] . . . is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.") . . . .

—— U.S. at —— n.10, 101 S.Ct. at 2531 n.10 (citations omitted).

al law, 18 U.S.C. § 1961(1), and a defendant may be punished separately for the RICO violation and the predicate crimes. *E. g., United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). The Act expressly sought to establish new penal prohibitions, and to provide enhanced sanctions and new remedies. 84 Stat. 923. And RICO was intended to augment other provisions of the criminal law, and not to limit or be limited by them. *See United States v. Barton,* 647 F.2d 224, 235–238 (2d Cir. 1981).

### B. *Hobbs Act Jurisdiction*

The Hobbs Act provides that it is unlawful to "affect[ ] commerce . . . by . . . extortion." 18 U.S.C. § 1951(a). Extortion is defined in pertinent part as "the obtaining of property from another, with his consent, induced . . . under color of official right." 18 U.S.C. § 1951(b)(2). Each defendant was alleged to have affected commerce by obtaining "top money" from "the boys" under color of official right. Defendants contend that the government failed to prove that the taking of top money affected commerce. Angelilli argues in addition that there was no proof that any of the four "boys" from whom he was proven to have received top money was engaged in commerce. To the contrary, we find adequate evidence to support a conclusion that commerce was affected.

The jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. *See United States v. Gambino,* 566 F.2d 414, 418 (2d Cir. 1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Even a potential or subtle effect on commerce will suffice. *See United States v. Augello,* 451 F.2d 1167, 1170 (2d Cir. 1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972); *United States v. Calder,* 641 F.2d 76, 78 (2d Cir. 1981); *United States v. Tropiano,* 418 F.2d 1069, 1076–77 (2d Cir. 1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970). In *Calder,* for example, we found the requisite impact on interstate commerce in the extortion of $300 per week from a restaurant that had no liquor license, but that purchased de-alcoholized wine from a Canadian company.

In the present case there was ample evidence that many of "the boys" did business in interstate commerce. They purchased goods from out-of-state buyers and resold in New York; they purchased in New York, advertised in the *New York Times* (which the district court took judicial notice is circulated outside of New York), and sold to buyers from outside the state.

As for Angelilli's individual contention, we note that one of the four persons who purchased from him testified that he sometimes sold to out-of-state buyers the merchandise he had bought at marshals' auctions. And in any event, since "the boys" acted as a unit in purchasing at the collusive price at the marshals' auctions, a marshal's sale to one of "the boys" who himself happened not to engage in interstate transactions would nevertheless have the required effect on interstate commerce since he was "kippered" with those who dealt interstate. The evidence of effect on commerce was sufficient as to all defendants to sustain the Hobbs Act convictions.

### C. *Mail Fraud*

The mail fraud statute provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, *for the purpose of executing such scheme or artifice or attempting so to do,* places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom,

any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (emphasis added). The government charged that defendants violated the mail fraud statute when, after rigging the auction prices of the judgment debtors' property and taking their "top money," they mailed to the judgment creditors' attorneys checks representing the proceeds of the sales, "falsely and fraudulently claiming that the remitted proceeds represented the amount received at the respective sales when in fact they had received additional 'money on top,' which fact was concealed from the judgment creditors." Butler, Irish, and Ribotsky, who stipulated that they mailed certain checks to attorneys who represented judgment creditors, were convicted of mail fraud.[11] They attack their convictions by arguing that because they had already received their top money before the checks were mailed, their mailings were, as a matter of law, not for the purpose of executing the schemes to defraud. This contention cannot be sustained.

The evidence at trial revealed two respects in which the jury could have found that in fact the mailings were for the purpose of executing the fraudulent schemes. First, the mailings themselves were fraudulent. They represented to judgment debtor and creditor that the property levied on had been sold at a certain price; in fact the collusion between the marshal and "the boys" had resulted in a fraudulently low price, and even the immediate out of pocket cost to the buyers was not revealed, because the "top money" was not reflected in the mailings. In addition, the transmitting of checks representing the proceeds of the sale was a necessary step in executing the schemes because it was designed to lull the debtors and creditors into believing that the defendants had duly sold the property at auction. Had no checks been sent, or had the truth been revealed as to the amount for which the property was sold, the schemes would have failed.

Under the pertinent authorities, it is clear that the defendants' mailings were within the purview of the mail fraud statute. *See* *United States v. Sampson*, 371 U.S. 75, 80, 83 S.Ct. 173, 175, 9 L.Ed.2d 136 (1962); *Pereira v. United States*, 347 U.S 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In *Sampson*, the defendants represented that they could help businessmen either to sell their businesses or to obtain loans. Defendants' salesmen received fees from the victims which they converted to cashiers' checks and mailed to the defendants' regional offices, which in turn mailed form acceptance letters to the victims. The district court dismissed the indictment on the theory that the fraud was complete when the victims paid the fees. The Supreme Court reversed, holding that the

> defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims. The indictment specifically alleged that the signed copies of the accepted applications and the covering letters were mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed. We cannot hold that such a deliberate and planned use of the United States mails by defendants engaged in a nationwide, fraudulent scheme in pursuance of a previously formulated plan could not, if established by evidence, be found by a jury under proper instructions to be "for the purpose of executing" a scheme within the meaning of the mail fraud statute.

11. While Angelilli stipulated that the checks drawn by him and listed in the indictment represented money realized from his auction sales and were made payable to attorneys for judgment creditors, he refused to stipulate to having used the mails. The government sought to prove at trial that Angelilli had mailed these checks, but the jury acquitted him of this charge.

371 U.S. at 80–81, 83 S.Ct. at 175–176. *See also United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975) (mailing of stock certificates and confirmations of stock purchases are sufficiently connected to scheme to constitute mail fraud: "post-purchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme."); *United States v. MacClain*, 501 F.2d 1006, 1011–12 (10th Cir. 1974). Such "lulling" mailings are essential to the fraudulent schemes in cases like *Sampson* and the present one, where the frauds are "not isolated and unrelated swindles," *Bliss v. United States*, 354 F.2d 456, 458 (8th Cir.), *cert. denied*, 384 U.S. 963, 86 S.Ct. 1592, 16 L.Ed.2d 675 (1966) (defendant mailed a few initial payments to victim-investors while simultaneously seeking other victims), and where "the scheme continues and repeats over an extended period of time." *United States v. Boyd*, 606 F.2d 792, 794 (8th Cir. 1979) (mails used as part of continuing scheme to obtain federal grants from which defendant took kickbacks).

Defendants' reliance on the Supreme Court's decisions in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); and *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), is misplaced. In each of those cases, the fraud was complete prior to the mailing, in that the defendant had already received all of the purloined property or services and had no further communication with the defrauded party. In *Kann*, for example, the fraud alleged involved diversion of funds from one corporation to a dummy corporation; the scheme was completed when the phony checks were cashed, and the funds received, by the defendants. The alleged mailings were made by the check-cashing bank, to collect from the drawee bank. Although the defendants initiated this chain of events, the mailing was held entirely unnecessary to their scheme. In *Maze*, the defendant had charged food and lodging on a stolen credit card. The fact that the merchants later mailed a bill to a bank, which in turn mailed a bill to the card's rightful owner for payment, was held incidental—and indeed counterproductive—to the scheme.

In the present case, given the defendants' own need to communicate with the victims of their fraud, and to make fraudulent representations in those communications, we conclude that the mailings were made for the purpose of executing a scheme within the meaning of the mail fraud statute.

### D. Evidence of Custom and Practice

We turn finally to the defendants' challenge to the prosecution's evidence that the demand and acceptance of top money was a regular custom and practice of the New York City marshals.[12] The defendants contend that the admission of such evidence was error and was highly prejudicial to them. For the reasons that follow, we find no basis for reversal.

The government elicited testimony from no fewer than 13 witnesses—all of the buyers, all of the auctioneers, and former marshal Ortiz—that it was the custom and practice of marshals to demand, either directly or through their auctioneers, money on top. The rationale on which this evidence was offered and received is not wholly unobscured. When the prosecutor posed the first custom and practice questions early in the trial, the district court allowed the testimony as "background," instructing the jury at that time that "it does not bind any defendant. This is just background as to what happens if you believe his testimony in the cases where there are fraudulently conducted sales." (Tr. 241.) Despite mention of a different rationale shortly there-

---

12. Testimony was elicited with respect to certain other customs and practices as well, including the related custom and practice of "the boys" to discourage outsiders, and certain ministerial customs relating to the signing of the bill of sale after an auction. The custom and practice with which we deal on this appeal is that of the marshals' demanding money on top.

after in the absence of the jury,[13] the court several days later in effect reiterated its first instruction during the custom and practice testimony of another buyer: "this is not direct evidence against any defendant, except as the witness indicates that a particular accused participated in it." (Tr. 1094.) Toward the end of the government's presentation of this type of evidence, however, the court informed the jury as follows: "I am admitting evidence on custom and practice because you may from the custom and practice and all the other evidence infer that the defendants engaged in the general custom and practice . . . ." (Tr. 2060–61.)

Nevertheless, by the time the jury was to be charged at the close of the evidence and summations, the district court had revised its view of the proper role of the custom and practice evidence: it instructed the jury that custom and practice evidence could be used only for the limited purpose of assessing whether the government had proven the existence of a conspiracy as charged in Count I of the indictment. The court instructed the jury that neither the custom and practice testimony, nor the evidence of top money demands other than those specifically alleged in the indictment against the four defendants could be used to prove that the defendants committed any of the substantive crimes charged:

> Now, there was evidence of sales that were not charged in the indictment. Evidence came before you on the custom and practice among marshals in conducting sales, just generally among what was called the business of selling judgment-debtor assets. The evidence of sales that were not charged in the indictment may only be used in determining whether the government established the existence of the conspiracy charged and for no other purpose. The evidence of custom and practice in the conduct of marshals' sales may be considered in determining whether the conspiracy charged was established. It is limited to such use and it may not be considered in determining whether the accused committed the other crimes charged in the indictment.

(Tr. 4847.) The substance of this instruction was repeated in response to the jury's request, shortly after it retired to deliberate, for clarification of "what constitutes conspiracy." The clarification included the following:

> You can take into consideration all the statements made by all the alleged conspirators to determine whether the government proved such a conspiracy. You can take into consideration proof of custom and practice, and as I said, that evidence is solely on the issue as to whether there was such a conspiracy.

(Tr. 4907.)

Defendants argue that the admission of the custom and practice evidence was barred by Fed.R.Evid. 404(b) because that evidence referred to other acts and was designed to show that the defendants acted similarly. We agree with the district court's final analysis that the custom and practice testimony was admissible for a limited purpose. Such testimony could proper-

---

**13.** On the following day, the court appeared to rule, in the absence of the jury, that this custom and practice testimony was admissible to show the marshals' awareness of wrongdoing:

> The reason I am permitting custom and practice in the trade is because if the Government can show that there was a custom and practice in the trade, and that that custom and practice involved fraudulent auction sales, because they were involved in the trade, the jury from that may infer that they are aware of what they were doing and the specific acts—

(Tr. 412.) The government argues on appeal that the evidence was admissible with respect to the state of mind of the *buyers*, an issue for Hobbs Act purposes. Several of the buyers testified in effect that paying top money was the only way to do business at marshals' auctions because the practice was so widespread; if they did not ante up they could not buy in the future from this marshal, and to buy in the future from other marshals would require payment of top money to the latter. *See, e. g., United States v. Kennedy*, 291 F.2d 457 (2d Cir. 1961). Although this rationale has some merit it does not appear to have been articulated clearly during the trial, and it does not appear that the jury was ever instructed that it could consider the custom and practice testimony for this purpose. Indeed, the court's closing charge was to the contrary. *See infra.*

ly be considered in determining whether or not the government had proven the existence of a broad conspiracy among marshals to demand top money, as alleged in the indictment, but it could not be considered in reaching a finding as to whether or not any of the defendants themselves demanded or received top money. The key to both conclusions is the scope of Rule 404(b).

Rule 404(b) provides as follows:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To the extent that the evidence related to acts other than those charged, it was admissible under the second sentence of Rule 404(b) to show a continuous plan. Insofar as the evidence, on the other hand, reflected a custom and practice that was part of the alleged conspiracy itself, it was not inadmissible under the first sentence of the Rule because the conduct did not represent *other* acts. *See, e. g., United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2633, 49 L.Ed.2d 378 (1976); 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5239 (1978):

In cases where the incident offered is part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an "other" crime. The evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused.

*Id.* at 450 (footnote omitted).

Since the acts were part of the conspiracy, evidence of their occurrence was admissible to prove the conspiracy, regardless of whether they were performed by the defendants or by other coconspirators. *See,*

e. g., *United States v. Araujo*, 539 F.2d 287, 289 (2d Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976); *United States v. Papadakis*, 510 F.2d 287, 294–95 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Costello*, 352 F.2d 848, 854 (2d Cir. 1965), *rev'd on other grounds*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *United States v. Bates*, 600 F.2d 505 (5th Cir. 1979); *United States v. Vega-Limon*, 548 F.2d 1390 (9th Cir. 1977); 22 C. Wright & K. Graham, *supra*, § 5239, at 451. In *Papadakis*, for example, we approved the receipt of evidence, to prove the existence of the conspiracy, that on several occasions not charged in the indictment the defendant and others conducted themselves in a manner similar to that charged. And in *Costello*, we stated that

the acts of others not involving the defendant directly may come in against him merely to show the existence of a conspiracy, with which he is to be linked by quite separate proof.

352 F.2d at 854. Even acts prior to the first act alleged in the indictment may be proven to show the continuing nature of the conspiracy. *Id.*

We see no error in the district court's receipt of evidence as to some of the conspiratorial acts in a somewhat generalized form. For example, rather than detailing each of the top money demands they had made or witnessed as auctioneers and/or buyers over the years, the witnesses generally testified as to how many marshals' auctions they had attended in those capacities, and estimated in what percentage of those cases top money had been demanded. It was within the district court's discretion, after assuring itself that such evidence was based on personal knowledge, *see* Fed.R.Evid. 403, 602; *see United States v. Brown*, 548 F.2d 1194, 1198 n.13 (5th Cir. 1977), to permit the testimony to be given in that form. Likewise we find no error in the court's permitting these experienced witnesses [14] to draw expert inferences

14. The experience of the witnesses ranged from that of buyer Barry Stampler, who had attended 250–300 marshals' auctions over a two-year period, to that of Nathan Weisser who had been an auctioneer for twenty-eight years.

as to the existence of a custom and practice among marshals to demand top money. Their opinions were properly admitted under Fed.R.Evid. 702 [15] to assist the jury in determining whether there was a broadscale agreement among marshals to demand top money.

While we conclude that the custom and practice evidence was admissible for the purposes we have discussed, we agree with the defendants that Rule 404(b) barred its use to prove that the individual defendants acted in conformity with the custom and practice. The district court ultimately agreed with this view, as evidenced in his final and supplemental charges to the jury. But, as noted earlier, during the testimony of one buyer, the court had instructed the jury that it was permitted to infer from the custom and practice evidence that the defendants individually had engaged in the custom and practice. To the extent that the custom and practice evidence consisted of testimony as to a defendant's other acts, the interim instruction—which made no mention of plan, or knowledge, or any other use of the evidence permissible under the second sentence of Rule 404(b), but instead expressly permitted the inference that the defendant had acted as charged in the indictment—was contrary to the prohibition of the first sentence of Rule 404(b). This use of the other act evidence would require an inference that the other act showed the defendant's propensity to perform acts of that type, and a further inference, from that propensity, that the defendant therefore performed the act charged. *See* 22 C. Wright & K. Graham, *supra*, § 5239, at 460–61. Such a chain of inferences, even if the person who performed the other acts is the person whose conduct is in issue, is logically so weak that the relevance of the factual evidence will nearly always be outweighed by the probable prejudice resulting from its admission. The logical weakness is the reason for the general prohibition of Rule 404(b):

> The basic reason for the inadmissibility of evidence of other crimes, wrongs, or acts is that such evidence is irrelevant to prove the conduct in question. As Wigmore says, it "has long been accepted in our law ... [t]hat 'the doing of one act is in itself no evidence that the same or a like act was again done by the same person' ...." The reason for this is that our knowledge of the causes of human conduct is too weak to provide any major premise that will support the desired inference....

> The only explanatory model for human conduct expressly recognized by the law of evidence is the concept of "character." But our confidence in this construct is so weak that its explicit use is only authorized under special circumstances.

22 C. Wright & K. Graham, *supra*, § 5239, at 436 (footnotes omitted).

**15.** Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The court charged the jury that the testimony as to custom and practice was opinion testimony:

> Witnesses, as I indicated, were called to the stand. They testify only to what the witness saw or heard. There is an exception to that general rule. Witnesses who by reason of education and experience have become expert in some art, science, profession, or calling, may state an opinion as to relevant and material matter, in which they profess to be expert, and may also state their reasons for that opinion.

> For example, Dr. Ober was called to testify on Mr. Irish's hearing problems. Some witnesses testified that they were familiar with the custom and practice among marshals who were charged with the duty and who performed the duty of selling judgment debtors' assets. Because of their experience they could express an opinion as to custom and practice. You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves. You don't have to accept an expert's opinion at face value. The credibility of the opinions or the testimony of experts is judged like the testimony of any other witnesses.

(Tr. 4811.)

Moreover, to the extent that the chain of reasoning requires an inference that the individual defendants committed certain acts based on evidence that other acts were performed by other persons, it is even more tenuous. In giving the interim instruction permitting such an inference, the court apparently relied on Fed.R.Evid. 406, which provides as follows:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

We do not believe that this Rule authorized the interim instruction. We begin by noting that the challenged evidence concerned the custom and practice of marshals as a group rather than the "habits" of individual defendants. While various witnesses testified that one or more of the defendants had, on specific occasions, demanded and been paid top money, none testified that it was the habit of such defendant to do so. Thus, the interim instruction permitted the jury to infer conduct of an individual on the basis of the custom of an organization. It may be that the ambiguous structure of Rule 406—which does not link the conduct of a person expressly with proof as to the habit of that person, nor the conduct of an organization expressly with proof as to the routine practice of that organization, *see* 23 C. Wright & K. Graham, *Federal Practice and Procedure* § 5273, at 42 (1980)—was intended to make admissible the evidence of the practice of the organization to prove the conduct of any of its members. As a matter of policy, however, we cannot countenance that application of the Rule here, *see* 23 C. Wright & K. Graham, *supra*, § 5275, at 56, since it would defy the principle of the individuality of guilt to hold that a defendant's mere membership in an organization practicing a particular type of crime could be used to show that the defendant himself committed such a crime. We conclude that the district court's interim instruction, which allowed the jury to use the custom and practice evidence to infer that the defendants demanded top money, was incorrect.

The conclusion that there was error, however, does not end the inquiry, for the Judicial Code instructs us that an incorrect ruling does not require the reversal of a judgment if the error was "harmless":

> On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

28 U.S.C. § 2111 (1976). The leading criminal case construing the predecessor of § 2111 is *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and its standards remain authoritative under the present provision. *United States v. Frank*, 494 F.2d 145, 161 n.19 (2d Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974). In *Kotteakos*, the Supreme Court pointed out that in evaluating whether an error was harmless an appellate court is not to determine guilt or innocence, nor to speculate upon probable reconviction. 328 U.S. at 763, 66 S.Ct. at 1247. Rather, it is to determine, "in relation to all else that happened,"

> what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

*Id.* at 764, 66 S.Ct. at 1247.

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial

rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764–65, 66 S.Ct. at 1247–1248 (footnote and citations omitted).

■ After a review of the record as a whole we are convinced, for several reasons, that the district court's erroneous interim instruction did not influence the jury in the slightest. First, the court's final charge gave the jury the correct instruction and gave it in clear, concise, and unambiguous terms: the jury could consider custom and practice only in determining whether the existence of a conspiracy had been proved, not in considering any other alleged crime. Second, the jury did not appear to hark back to the interim instruction, which had been given more than two weeks before the final charge; it never requested reiteration of that earlier instruction; and when it asked for clarification of the court's final charge on conspiracy, it neither singled out the custom and practice portion for particular review, nor appeared to question the court's repeated admonition as to the limited role of that evidence.

Most importantly, contrary to defendants' contention that "the fate of the individual defendants at bar was sealed" by the receipt of the custom and practice evidence, it is clear that the jury did not indiscriminately find the defendants guilty. As to Angelilli, it found four of the ten alleged extortionate transactions not proved and found all five of the alleged mail fraud transactions not proved. As to Butler, it found two of the eight alleged extortionate transactions not proved. And as to Ribotsky, it found one of the four alleged extortionate transactions not proved. The jury's concentration on individual transactions was evident not only from its ultimate conclusions, but also from the nature of its numerous requests for taped and documentary evidence and for the rereading of certain testimony during its deliberations. In every instance the request related to evidence of specific auctions held or attended by one of the defendants. In no instance did the jury make any request that appeared to be concerned with custom and practice evidence.

Finally, we note that in only one rereading of testimony requested by the jury was there any mention of the custom and practice of demanding top money. This evidence related to a transaction in which the buyer testified that he had paid top money but that he could not recall whether he had handed the money to Butler or to his auctioneer. When asked why he had paid top money, he answered, "Practice and custom I think was the word used here just a few minutes ago." On this single occasion, then, some custom and practice testimony was reread to the jury. This, however, was one of the transactions that the jury found *not* proved.

In all the circumstances we are left with the certain conviction that the erroneous instruction had no effect, and that the custom and practice evidence was not misused.

## CONCLUSION

The convictions of all defendants are affirmed. The judgment as to Angelilli is remanded for correction to reflect his acquittal of the mail fraud charge under 18 U.S.C. § 1341.

FRIENDLY, Circuit Judge, concurring in the result:

I am unable to agree with the portion of Judge Kearse's excellent opinion that holds the New York Civil Court to be an "enterprise" within the meaning of 18 U.S.C. § 1962(b). No one would think of describing a court as an "enterprise" as a matter of ordinary English speech. Black's Law Dictionary, 5th Ed. defines enterprise as: "A venture or undertaking especially one involving financial commitment." The only pertinent definition in the Random House Dictionary of the English Language is "a company organized for commercial purposes; business firm." Definitions in other dictionaries I have consulted are even less

pertinent. The problem here is totally different from that in *United States v. Turkette*, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), where the Supreme Court criticized the First Circuit for reading the word "legitimate" into Congress' definition of "enterprise". The issue in *Turkette* was whether there was any justification for excluding from the term "enterprise" an association that would normally be deemed to come within it. The question here is whether there is any justification for expanding the term to include something that would normally be deemed to fall outside it. Conceivably the group of marshals who engaged in the sordid activities described by the majority could be deemed an "enterprise". But that was not what the indictment charged or what the jury was told it must find in order to convict. It is of no consequence, as the majority urges, that obstruction of law enforcement is included in the definition of "racketeering activity" in § 1961(1). As the Court said in *Turkette, supra*, —— U.S. at ——, 101 S.Ct. at 2528:

> The "enterprise" is not "the pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all time remains a separate element which must be proved by the Government.

For these reasons, as well as others expressed by Judge Swygert dissenting in *United States v. Grzywacz*, 603 F.2d 682, 690 (7 Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980), I would vacate the convictions under RICO, 18 U.S.C. § 1962(c) and (d), but would allow those under the Hobbs Act, 18 U.S.C. § 1951, and the mail fraud statute, 18 U.S.C. § 1341, to stand.

I must also express concern over so much of the discussion of F.R.E. 404(b), as relates to participation of the defendants in similar transactions which were not a part of the conspiracy.[1] I could not at all agree that proof that one of the defendants had performed other acts of the precise nature of those here charged during much the same time frame would be "logically so weak that the relevance of the factual evidence will nearly always be outweighed by the probable prejudice resulting from its admission." Opinion, p. 40. The crimes here charged were sufficiently unusual that such evidence would have been highly relevant as proof of design or system under Rule 404(b), see 2 Wigmore, Evidence, § 304 at 249 (Chadbourn rev. 1979)—"such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." McCormick also approves the use of evidence of other crimes by the accused "so nearly identical in method as to earmark them as the handiwork of the accused"—a device "so unusual and distinctive as to be like a signature", Evidence, § 190 at 449 and cases cited (Cleary ed. 1972). Judge Weinstein's Treatise on the Federal Rules of Evidence agrees that Rule 404(b) permits proof of prior crimes by the accused "when details of the crime show an individuality that, if repeated, are highly probative of the conclusion that they were committed by the same person." 2 Evidence ¶ 404.16 at 404–92–93 and cases cited in notes 21 and 22 (1980). Indeed, the Wright & Graham treatise cited by the majority seems to acquiesce in this view. See 22 Wright & Graham, Federal Practice and Procedure, § 5244 at 501 (1978). While it would have been appropriate for the judge to explain the limited basis for which the evidence was admitted, he was not bound to do so, at least in the absence of a request. See 2 Weinstein, *supra*, ¶ 404.19 at 404–117–119.

---

1. As to acts which were a part of the conspiracy, I agree that Rule 404(b) has no application since these would not be "other crimes". Since it is not at all clear that the evidence of custom and practice did include any act of defendants that were not a part of the conspiracy, this portion of the opinion may well be unnecessary dictum.